[Cite as *State v. Penwell*, 2023-Ohio-120.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-05-026 |
| | : | O P I N I O N |
| - vs - | | 1/17/2023 |
| | : | |
| JEREMY PENWELL, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21CR38501

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

The Law Office of Wendy R. Calaway, Co., LPA, and Wendy R. Calaway, for appellant.

**PIPER, J.**

{¶ 1} Appellant, Jeremy Penwell, appeals the verdict of guilty and sentence he received in the Warren County Court of Common Pleas.

{¶ 2} On September 14, 2021, at approximately 8:00 a.m., Aleksandre Begheluri was driving a car-hauler truck on his way to have the vehicle inspected. While driving, Aleksandre noticed that a chain for the trailer ramp was hanging loose on the passenger

side.  Aleksandre parked his truck in the middle emergency lane of Grandin Road and exited his truck to secure the chain.  While he was outside the vehicle, Aleksandre was struck and killed by another vehicle.  The vehicle that struck him did not stop.

{¶ 3}  Police obtained surveillance recordings from several nearby businesses which showed a black Honda Pilot driving by Aleksandre's truck near the time of the collision.  Throughout the day, officers canvassed the area for similar vehicles.  At approximately 4:00 p.m., Officer Kyle Treon and Sergeant Chris Wall observed a black Honda Pilot at a nearby gas station near where Aleksandre had been struck and killed.  They observed that the vehicle had been damaged in multiple places.  As they were examining the vehicle, Penwell came out of the gas station.  Sergeant Wall explained why they were looking at his vehicle and described the nature of their investigation.  Penwell denied any involvement telling the officers that "he doesn't even come that way to work."  The officers did not observe any indication that Penwell was impaired at that time and were not able to establish any link between Penwell's vehicle and the collision.  Therefore, they took Penwell's name and license plate number and allowed him to leave.

{¶ 4}  That evening, the local news reported on the hit-and-run, including that the suspect had been driving a black SUV.  Shortly thereafter the police department began receiving information from citizens about the Honda Pilot and Penwell.  Alex Webb told authorities that he had an interaction with an individual in a black Honda Pilot shortly after 7:00 a.m. at a BP gas station.  Webb reported that he observed a black Honda Pilot parked and running at a gas pump with the driver's door cracked open.  He stated that the driver, who he later identified as Penwell, was "slouched over" in the driver's seat seemingly asleep with his eyes closed.  Based upon his experience, Webb believed that Penwell was overdosing or passed out on drugs.  Around the same time, another man banged on the hood of Penwell's Honda Pilot.  Penwell did not react.  Webb and the unidentified man

approached Penwell together. Penwell offered the excuse that he had been up late the night before helping his grandfather clean a shed. Penwell then exited his car and went into the gas station while Webb returned to his vehicle and drove to work. Penwell drove off shortly thereafter.

{¶ 5} Several of Penwell's coworkers also offered their observations of Penwell's condition the morning of September 14. James Britton saw Penwell arrive at their construction site off State Route 48 at approximately 8:15 a.m. As Penwell was talking to another coworker, Britton overheard Penwell say that he had hit a "semi" on the way into work. Britton also believed that Penwell "seemed messed up * * * like he was on an opiate of some sort." Britton described that Penwell was falling asleep standing up, nodding off, and slurring his words. Britton indicated that he had seen individuals that were "dope sick," meaning that the person was experiencing withdrawal symptoms from opiates, and that Penwell did not appear dope sick. To the contrary, Britton stated that Penwell seemed to sober up and become more coherent as the day went on.

{¶ 6} Another coworker, Jason Breaker, also saw Penwell the morning of the fatal collision. Breaker stated that he was in a home being constructed and was about to hang cabinets when he saw Penwell. Penwell said that he had hit a semi on Grandin Avenue on his way to work. Breaker, who had a prior heroin addiction, believed that Penwell was high and was a "little out of it." Breaker testified Penwell was "slurring his words a little bit. Eyes kind of down. Just wasn't real alert or awake." Based upon his experience, Breaker testified that Penwell was acting like someone under the influence of opiates and was not dope sick. Later, Breaker observed a dent on the driver's side of Penwell's vehicle between the wheel and the door. At lunch time, Breaker observed Penwell try to pry the dent out with a prybar, which was partially successful.

{¶ 7} After receiving information identifying Penwell as a person of interest, law

enforcement obtained a search warrant for Penwell's vehicle and arrested him. Testing of swabs from the driver's side front bumper showed the presence of Aleksandre's DNA.

{¶ 8} In an interview with Detective Quillan Short, Penwell said that he was 15 minutes late to work that morning, arriving at approximately 7:45 a.m. He stated that he normally took the Zoar Road exit off of I-71. Detective Short advised him that no such exit existed. When asked if he had ever exited I-71 at Kings Island and traveled across Grandin Road, Penwell said he was not familiar with that road. When asked if he had struck anything that morning, Penwell responded that his vehicle had been struck by something, but he did not know what it was and that he did not stop because he was running late to work. Penwell denied using any illegal drugs, specifically heroin, that day. Penwell claimed that he was dope sick because he had not been paid and therefore was unable to buy heroin. Penwell admitted to prying out a dent in the driver's side door because the door would not open correctly. On the way to the jail, Penwell told Detective Short that he drove across Grandin Road that morning when it was still dark out and that he could not see what he hit but thought maybe it was an animal.

{¶ 9} While in jail, Penwell made phone calls containing incriminating information. In a recorded jail phone call with his grandfather, Penwell stated that he did not know what had happened that morning because he blacked out or "fell out" and was "dead at the wheel." In another recorded jail phone call, Penwell reported that he could not remember what happened and that the "shit" had Xanax in it that scrambled his brain.

{¶ 10} The Warren County Grand Jury indicted Penwell for (1) aggravated vehicular homicide under R.C. 2903.06(A)(1)(a), a second-degree felony, (2) aggravated vehicular homicide under R.C. 2903.06(A)(2)(a), a third-degree felony, (3) failure to stop after an accident under R.C. 4549.02(A)(1)(a), a third-degree felony, and (4) operating a vehicle under the influence under R.C. 4511.19(A)(1)(a), a first-degree misdemeanor. Following a

jury trial, Penwell was found guilty as charged.

{¶ 11} The trial court sentenced Penwell to a six-to-nine-year prison term on the second-degree felony count of aggravated vehicular homicide and a 12-month prison term on the count of failure to stop after an accident. The remaining offenses were merged. The trial court ordered the terms be served consecutively for a total prison term of seven-to-ten years. Penwell now appeals, raising three assignments of error for review.

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT ERRED IN CONVICTING APPELLANT BASED ON INSUFFICIENT EVIDENCE AND IN CONVICTING HIM AGAINST THE MANIFEST WEIGHT OF EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT.

{¶ 14} In his first assignments of error, Penwell argues that his conviction is based on insufficient evidence and the jury's verdict was against the manifest weight of the evidence.[1]

{¶ 15} The concepts of sufficiency of the evidence and weight of the evidence are legally distinct. *State v. Wright*, 12th Dist. Butler No. CA2012-08-152, 2014-Ohio-985, ¶ 10. Nonetheless, as this court has observed, a finding that a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19. "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43.

{¶ 16} A manifest weight challenge scrutinizes the proclivity of the greater amount of

---

1. Penwell only presents argument as to Counts 1 and 3, aggravated vehicular homicide involving the use of drugs and failure to stop after an accident. Penwell does not present argument on Count 2 involving aggravated vehicular homicide (recklessly). Therefore, we will not address Count 2 in any detail except to note that Count 2 is also supported by the manifest weight of the evidence. We further note that the trial court merged Count 2 with Count 1.

credible evidence, offered at a trial, to support one side of the issue over another. *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. In assessing whether a conviction is against the manifest weight of the evidence, a reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 17} Penwell was convicted of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a), which prohibits any person, "while operating * * * a motor vehicle," from "caus[ing] the death of another * * * [a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code." Pursuant to R.C. 4511.19(A)(1)(a), no person shall operate a vehicle if, at the time of the operation, "[t]he person is under the influence of alcohol, a drug of abuse, or a combination of them."

{¶ 18} Penwell was also convicted of failure to stop after an accident in violation of R.C. 4549.02(A)(1)(a), which provides, in the case of a motor vehicle accident or collision on a public road or highway, "the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision." A person acts knowingly "regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id*; *State v. Jones*, 12th Dist. Butler No. CA2019-06-095, 2020-Ohio-857, ¶ 16.

{¶ 19} Penwell contests his convictions under two theories. First, he claims that there was no evidence that he was driving his vehicle under the influence. He asserts there

was no toxicology testing, field sobriety tests, or eyewitness testimony. Second, Penwell argues there was no evidence that he knew that he had been in an accident at the time he struck the victim.

{¶ 20} Following a thorough review of the evidence, we find Penwell's convictions are supported by the manifest weight of the evidence and are not based upon insufficient evidence. At trial, Penwell did not contest that he hit Aleksandre and that the impact from his vehicle caused Aleksandre's death. Rather, he argued that he was not driving under the influence of drugs. Penwell claimed that he was dope sick and tired from staying up all night helping his grandfather and that Aleksandre was not visible to him, which was impacted by the sun being in his eyes.

{¶ 21} However, the state presented testimony that, if believed, established that Penwell was under the influence of drugs and knew that he had been in an accident at the time he struck the victim. The state presented evidence from Alex Webb who observed Penwell slouched over, asleep at the wheel, in his black Honda Pilot sometime between 7:00 a.m. and 7:30 a.m. that morning. Webb noticed that Penwell did not react when another person banged on the hood of Penwell's vehicle. Webb had seen this behavior before and believed that Penwell was overdosing or passed out on drugs. In other words, Penwell was not dope sick as he suggested. Rather, Penwell exhibited visible signs of impairment while at the gas station.

{¶ 22} The state then presented evidence that the collision that killed Aleksandre occurred after Penwell left the gas station while he was driving to his work site. Upon reaching his work site, Penwell's coworkers, Breaker and Britton, observed that Penwell was under the influence. Breaker was a former heroin addict and is familiar with the meaning of dope sick. Breaker testified that Penwell appeared intoxicated on opiates when he arrived at work that morning. He described Penwell as "slurring his words a little bit.

Eyes kind of down. Just wasn't real alert or awake." Breaker stated that Penwell did not exhibit symptoms of being dope sick. Britton also testified that Penwell appeared to be under the influence of opiates. He described him as "falling asleep standing up, pretty much. He was nodding out sort of" and slurring his words.

{¶ 23} This testimony was further corroborated by Penwell's own statements. In a recorded jail phone call with his grandfather Penwell stated that he could not remember the accident and that "[i]t's blacked out of my mind. It's blacked out. I dunno. I fell out." During his testimony, Penwell admitted that the term "fell out" refers to being under the influence of opiates, but still denied that he was under the influence of drugs. Instead, he testified that was going through withdrawals. Yet, in another recorded jail phone call describing why he could not remember the accident, Penwell told his cousin "shit had Xanax in it. Scrambled my brain a lot." Whether Penwell's denial on the stand was more believable than his statements made in the recorded jail phone calls was a credibility determination best weighed by the trier of fact. *State v. Vunda*, 12th Dist. Butler Nos. CA2012-07-130 and CA2013-07-113, 2014-Ohio-3449, ¶ 45.

{¶ 24} Contrary to his suggestion otherwise, the state presented ample evidence to support a finding that Penwell was under the influence of a drug of abuse when he struck and killed Aleksandre. The state was not required to prove its case with blood, breath, or field sobriety tests, nor did the state need to present evidence of a witness having observed Penwell using drugs that day. *State v. Robinson*, 3d Dist. Allen No. 1-19-79, 2020-Ohio-4880, ¶ 22-24; *State v. Sanford*, 9th Dist. Lorain No. 18CA011308, 2021-Ohio-1619, ¶ 25. While a toxicology report may be *probative* that one was driving under the influence, the facts contained in such a report "would be by no means *necessary* in the prosecution of those offenses." *Sanford* at ¶ 25 (Emphasis in original). Such is the case as here where Penwell was observed by several people as being impaired and behind the wheel of a

vehicle well before he was identified as a suspect. In fact, the testimony from Penwell's coworkers indicated that Penwell arrived at work under the influence and then sobered up or became more coherent as the day went on. Penwell's statements to his grandfather and to his co-worker corroborate Penwell's impaired driving, a fact bolstered by his misleading and untruthful statements to law enforcement.

{¶ 25} We further find the evidence supports the conclusion that Penwell had knowledge of the accident and therefore his conviction for failing to stop after an accident is supported by the manifest weight of the evidence and is not based upon insufficient evidence. The state presented evidence that Breaker told a coworker that he had hit a "semi" on his way into work and was seen prying a dent out of his vehicle during his lunch break. Penwell further admitted to Detective Short that he knew his vehicle had struck something that morning but that he did not stop because he was running late to work but thought he may have hit an animal.

{¶ 26} Additionally, the jury may make reasonable inferences from the fact that Penwell attempted to mislead law enforcement as to the damage on his vehicle and the route he travelled to work. Denying he was on the road where the accident occurred only to have it proved he was, significantly diminished Penwell's credibility with the jury. Indicating to law enforcement he may have hit an animal, but previously telling a co-worker he hit a semi, similarly gives Penwell little credibility.

{¶ 27} While Penwell's version of events may differ from those of the state, "'[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony'" for it is entirely appropriate for the jury to believe the testimony of some witnesses while disregarding the testimony of others. *State v. Sias*, 12th Dist. Madison Nos. CA2010-01-001 and CA2010-02-003, 2010-Ohio-3566, ¶ 18, quoting *State v. Lloyd*, Warren Nos. CA2007-04-052,

CA2007-04-053, 2008-Ohio-3383. Since his convictions are supported by the manifest weight of the evidence and are not based upon insufficient evidence, Penwell's first assignment of error is overruled.

{¶ 28} Assignment of Error No. 2:

{¶ 29} APPELLANT WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEEN [sic] AMENDMENT AND RELATED OHIO CONSTITUTIONAL RIGHTS.

{¶ 30} In his second assignment of error, Penwell alleges he received ineffective assistance of counsel.

{¶ 31} To prevail on an ineffective assistance of counsel claim, an appellant must establish (1) that his trial counsel's performance was deficient; and (2) that such deficiency prejudiced the defense to the point of depriving the appellant of a fair trial. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 16, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, (1984). Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Strickland* at 688. To show prejudice, the appellant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An appellant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other. *Vunda*, 2014-Ohio-3449 at ¶ 54.

**Authentication**

{¶ 32} First, Penwell argues that his counsel was ineffective for failing to object to the testimony of Officer Chris Kaufholz. Specifically, he claims that Officer Kaufholz testified about unauthenticated video evidence, which was later introduced in evidence. During trial, Officer Kaufholz testified that he arrived on scene shortly after the accident occurred, finding the victim unresponsive in the roadway. The victim's vehicle was still running and was

parked in the middle emergency lane. Officer Kaufholz identified several photographs of the scene, testifying that the photographs fairly and accurately represented what he saw on September 14, 2021.

{¶ 33} Officer Kaufholz conducted further investigation by responding to local businesses to see if their security cameras had captured the accident scene. One of those businesses was Elite Automotive. Officer Kaufholz testified that he reviewed some of the video at Elite Automotive and took custody of a copy of the security footage. He later watched the video at the station on a larger screen. The same video was subsequently played during trial and Officer Kaufholz testified that it fairly and accurately represented the video that he collected the day of the accident.

{¶ 34} Penwell's counsel did not object to this testimony. On appeal, Penwell claims the video evidence was inadmissible because no one from Elite Automotive authenticated the video and Officer Kaufholz's testimony was not a proper basis for authentication because he "testified that he only viewed the video at the source to verify camera angles." Therefore, Penwell argues that the state did not present evidence required to demonstrate a sufficient showing of the reliability of the process or system that produced the evidence. Penwell further argues that this error was compounded because Officer Kaufholz enhanced the video at the police department. Officer Kaufholz testified that when the video was played on the larger screen at the police department that he could see the suspect's vehicle swerve slightly after impact.

{¶ 35} Following review, we find Penwell's counsel was not deficient because the evidence was properly authenticated, and any objection should have been overruled. *State v. Kremer*, 12th Dist. Warren Nos. CA2017-07-115 and CA2017-07-116, 2018-Ohio-3339, ¶ 27 (it is not deficient for counsel not to raise a meritless issue).

{¶ 36} This court has previously acknowledged that photographic and video

evidence is generally authenticated in two ways. One way is a person with knowledge may state that the photograph or video represents a fair and accurate depiction of the actual item at the time the picture was taken. Evid.R. 901(B)(1); *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 66. In authenticating evidence through this method, there is no need to call the witness who took the photographs as long as a witness with knowledge can testify that the photograph is a fair and accurate depiction. *State v. Mick*, 12th Dist. Fayette No. CA2011-08-017, 2012-Ohio-1598, ¶ 32.

{¶ 37} An additional way to authenticate photographic or video evidence is under the "silent witness" theory. *Freeze* at ¶ 67, citing *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121 (1991).

> Under the silent witness theory, the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness. Therefore, photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence. Expert witness testimony is not required to demonstrate reliability.

*Id.* (citations omitted). In *Midland*, the Ohio Supreme Court found that a surveillance video tape was properly authenticated when a witness' testimony regarding the layout of the area corresponded with the video and the witness was the custodian of the video and testified that the video had not been altered. *Midland* at 130.

{¶ 38} Upon review, we find the state satisfied the threshold for authentication under either theory of authentication. In this case, Officer Kaufholz testified that he arrived at the scene of the accident shortly after the accident occurred. When he arrived, Officer Kaufholz observed the scene, including Aleksandre's truck and trailer in the emergency lane. Aleksandre's body had been knocked out of his shoes and blood had spilled all over the roadway. He was then presented with various photographs of the scene, which Officer Kaufholz testified were fair and accurate depictions of the scene when he arrived. Officer

Kaufholz further testified he obtained video footage from nearby businesses, including Elite Automotive. He explained that he watched some of the footage inside Elite Automotive to see how the cameras were angled. We disagree with Penwell's suggestion that Officer Kaufholz only looked at the angle of the cameras. Officer Kaufholz testified that he checked to see that the cameras were angled properly and was able to capture the scene. Officer Kaufholz also testified that he was able to observe Aleksandre's vehicle pull onto the road and was also able to observe when the 9-1-1 caller arrived on the scene.

{¶ 39} Contrary to Penwell's suggestion otherwise, Officer Kaufholz testified that the video shown at trial fairly and accurately depicted the video he collected from Elite Automotive and also fairly and accurately depicted what he viewed while at the police department. While Officer Kaufholz testified that the video was fair and accurate, the trial court could also have reasonably determined that the video provided was reliable under the silent witness theory, as the footage was consistent with testimony elicited by the state. *Freeze*, 2012-Ohio-5840 at ¶ 70; *State v. Spencer*, 4th Dist. Pickaway No. 19CA6, 2019-Ohio-3800, ¶ 17.

{¶ 40} We further find no merit to Penwell's claim that Officer Kaufholz "enhanced" the video. Officer Kaufholz merely testified that he used the zoom feature and played the video on a larger screen. There is no evidence that Officer Kaufholz manipulated or changed the video. Accordingly, we find that the video evidence was properly authenticated and admissible.

{¶ 41} We further note that Penwell's counsel may not have objected to this evidence based upon trial strategy, which would not constitute ineffective assistance of counsel. At trial, Penwell's counsel argued that the sun, and not drug impairment, contributed to the collision and referred to the video from Elite Automotive on a number of occasions. This court has repeatedly held that trial strategy, even debatable strategy, is not a basis for

finding ineffective assistance of counsel. *State v. Woody*, 12th Dist. Clinton No. CA2019-01-001, 2020-Ohio-621, ¶ 10. Accordingly, Penwell's counsel was not ineffective for failing to object to the admission of the video. *State v. Davis*, 2d Dist. Montgomery No. 28923, 2021-Ohio-1833, ¶ 24.

**Reagan Tokes Law**

{¶ 42} Penwell also argues that his counsel was ineffective for failing to object to the trial court's imposition of an indefinite sentence pursuant to the Reagan Tokes Law. This court has previously rejected an identical argument. *State v. Hodgkin*, 12th Dist. Warren No. CA2020-08-048, 2021-Ohio-1353, ¶ 17. Furthermore, for reasons set forth in more detail in Penwell's third assignment of error, this court has consistently held that the Reagan Tokes Law is constitutional and therefore, any objection would have been meritless. *Kremer*, 2018-Ohio-3339 at ¶ 27. Accordingly, we find that trial counsel was not ineffective for failing to challenge the constitutionality of the Reagan Tokes Law.

{¶ 43} In light of the foregoing, we find Penwell's second assignment of error is without merit and is therefore overruled.

{¶ 44} Assignment of Error No. 3:

{¶ 45} THE SENTENCE IMPOSED WAS CONTRARY TO LAW.

{¶ 46} In his third assignment of error, Penwell argues his sentence is contrary to law. An appellate court reviews the imposed sentence according to R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. R.C. 2953.08(G)(2) provides that an appellate court can modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law. *State v. Singh*, 12th Dist. Butler No. CA2021-12-158, 2022-Ohio-3385, ¶ 83.

**Reagan Tokes Law**

{¶ 47} Penwell first challenges the constitutionality of Ohio's indefinite sentencing structure as set forth in R.C. 2967.271. However, as previously noted, the record demonstrates that Penwell never raised this issue with the trial court. It is well established that the question of the constitutionality of a statute must be raised at the first opportunity and, in a criminal prosecution, this means in the trial court. *State v. Teasley*, 12th Dist. Butler No. CA2020-01-001, 2020-Ohio-4626, ¶ 9. Consequently, by not first raising the issue with the trial court, Penwell's arguments challenging the constitutionality of R.C. 2967.271 are forfeited and will not be heard for the first time on appeal. *Id.*

{¶ 48} We further note that the arguments raised by Penwell have been previously considered and rejected by this court. *State v. Bloodworth*, 12th Dist. Warren No. CA2021-08-073, 2022-Ohio-1899, ¶ 50. Specifically, this court has already determined that the Reagan Tokes Law does not run afoul of an offender's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. *State v. Henderson*, 12th Dist. Warren No. CA2020-11-072, 2021-Ohio-3564, ¶ 13-16; *State v. Jackson*, 12th Dist. Butler No. CA2020-07-077, 2021-Ohio-778, ¶ 12-15; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 7-17. We have also determined that the Reagan Tokes Law does not violate the separation-of-powers doctrine. *State v. Suder*, 12th Dist. Clermont Nos. CA2020-06-034 and CA2020-06-035, 2021-Ohio-465, ¶ 25; *State v. Castro*, 12th Dist. Warren No. CA2022-04-016, 2022-Ohio-4327, ¶ 13. For the reasons previously expressed in the above-cited cases, we find that the Reagan Tokes Law is not unconstitutional.

**Consecutive sentences**

{¶ 49} Next, Penwell challenges the trial court's imposition of consecutive sentences. When imposing consecutive sentences, a sentencing court is required "to make the findings

mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 50} "When imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing, and by doing so it affords notice to the offender and to defense counsel." *Bonnell* at ¶ 29, citing Crim.R. 32(A)(4). "[A] word-for-word recitation of the language of the statute is not required," though, "and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.*

{¶ 51} The supreme court has recently stated that consecutive sentence findings are not simply threshold findings that, once made, permit any amount of consecutively stacked

individual sentences. *State v. Gwynne*, Slip No. 2022-Ohio-4607, ¶ 1. Rather, the consecutive sentence findings must be made in consideration of the aggregate term to be imposed. *Id.* Appellate review of these findings does not require an appellate court to defer to the sentencing court's findings in any manner. *Id.* Instead, R.C. 2953.08(G)(2) requires appellate courts to review the record de novo and decide whether the record clearly and convincingly does not support the consecutive-sentence findings. *Id.*

{¶ 52} In this case, the trial court ordered that Penwell's sentence for failure to stop after an accident be served consecutively to his conviction for aggravated vehicular homicide. On appeal, Penwell states that the trial court checked a box in the sentencing entry indicating that the offenses were committed as part of one or more courses of conduct. However, Penwell notes that this finding was not made at the sentencing hearing. Penwell does not otherwise contest the consecutive nature of his prison sentence. The state concedes the disparity between the sentencing entry and the court's findings at the sentencing hearing but maintains that the issue can be corrected with a nunc pro tunc entry.

{¶ 53} Following review, we agree that there is a disparity between the findings made at the sentencing hearing and the trial court's sentencing entry. During the sentencing hearing, the trial court stated that "consecutive sentences are necessary in this case in order to punish the offender and protect the public from future crime, and are not disproportionate to the conduct or danger posed by the Defendant." The trial court further referenced Penwell's criminal history and found based on the factors present before the court, that consecutive sentencing was necessary. Despite making these findings at sentencing, the trial court checked the box on the sentencing entry indicating a different finding supporting consecutive sentences.

{¶ 54} Therefore, the trial court should issue a nunc pro tunc entry to correct its mistake so that the sentencing entry accurately reflects its pronouncements at the

sentencing hearing. *State v. Caldwell*, 12th Dist. Butler No. CA2022-04-032, 2022-Ohio-4035, ¶ 25. Aside from the need for a nunc pro tunc entry, Penwell's remaining arguments are overruled.

{¶ 55} Judgment affirmed in part, reversed in part, and remanded for the limited purpose of issuing a nunc pro tunc sentencing entry.

M. POWELL, P.J., and S. POWELL, J., concur.