[Cite as *State v. Davis*, 2025-Ohio-2382.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2024-03-004<br>CA2024-07-016 |
| | : | |
| - vs - | : | OPINION AND<br>JUDGMENT ENTRY<br>7/7/2025 |
| | : | |
| CHAD M. DAVIS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CRI20230097; CRI20230101

Jess Weade, Fayette County Prosecuting Attorney, and Rachel S. Martin, Assistant Prosecuting Attorney, for appellee.

Garrett Law Offices, and Dawn S. Garrett, for appellant.

## **O P I N I O N**

**SIEBERT, J.**

{¶ 1} Chad M. Davis appeals his convictions in the Fayette County Court of Common Pleas for multiple counts of aggravated trafficking in drugs and for engaging in a pattern of corrupt activity. On appeal, Davis asserts eight sprawling assignments of

error merit the reversal of his convictions. We overrule them all. The trial court made no error of law in denying Davis' motion to suppress or his motion for a new trial. The court made no prejudicial error in admitting a drug lab report and related testimony. Additionally, we conclude Davis' convictions were not against the manifest weight of the evidence, meaning there was sufficient evidence to support his convictions and overcome Davis' motion for acquittal. Davis also fails to show his sentence was contrary to law or disproportionate to those imposed on similarly situated defendants. Finally, Davis failed to demonstrate that he received ineffective assistance of counsel. Ultimately, Davis received a fair (albeit not perfect), trial, and we affirm his convictions and sentence.

## I. Factual and Procedural Background

{¶ 2} At all times pertinent to this appeal, Davis was in prison. During an undercover drug investigation by law enforcement, Brandi Wood, Davis' fiancé, became suspected of trafficking methamphetamine. The services of a confidential informant ("CI") was utilized on several occasions between the end of September 2022 and beginning of October 2022 to meet with Wood to complete drug transactions. The CI wore a discreet camera that recorded these interactions. On September 28, 2022, the CI purchased 27.91 grams (approximately one ounce) of methamphetamine from Wood and later 198.43 grams (approximately seven ounces). On October 5, 2022, the CI purchased 448.17 grams of methamphetamine (approximately 16 ounces or one pound).

{¶ 3} Video footage from the CI as well as phone calls recorded by Davis' prison show that Davis called Wood repeatedly before and during the CI's visits to Wood's apartment.[1] Before one of the CI's visits to Wood's apartment, Davis and Wood can be

---

1. The call system at Davis' prison limited the duration of phone calls placed by inmates. To keep talking to Wood, Davis had to place multiple calls.

heard discussing how much methamphetamine Wood had left to sell to the CI. After some apparent confusion from Wood, Davis said, "Listen, a half [pound] is Hector's . . . and there's one and a half left." Later, Davis commented on the CI's "terrible" past profits on methamphetamine, and when Wood asked Davis "What are you charging [the CI] for?" Davis responded, "$3200 for a whole [pound]" and $215 per ounce. Davis stated that the CI should be making at least $325-350 an ounce on the street. At one point during the discussion, Wood stated to Davis, "I'm going to tell [the CI] to do it like we do it."

{¶ 4} During at least one visit to Wood's apartment, the CI let herself inside, and the CI immediately encountered Wood sitting in the living room. The two began to engage in casual conversation, and at no point did Wood act surprised by the CI's arrival or ask the CI to leave. During these meetings, Wood had Davis on speakerphone. Most conversation was between Wood and the CI while Davis remained on the line and silent. However, Davis and the CI spoke directly with each other through Wood's speakerphone at multiple points. Davis can be heard advising the CI that she could make upwards of $2,000 profit on the drugs she received from them. The CI's demeanor with Wood and Davis was casual, and during one of their conversations, the CI remarked "next time, Chad, I want [a] friends and family [discount] and not just a friend." In another recording, Davis and the CI can be heard discussing splitting costs on a future bulk purchase of methamphetamine. Davis also stated to the CI during one conversation there was no concern about fentanyl in the drugs the CI was purchasing because "everything we get we test . . . We test everything we get as soon as we get it."

{¶ 5} Davis and Wood's phone conversations were not limited to discussing drugs. While discussing various repairs needed on a vehicle Wood had loaned to another individual, Davis commented that he thought the issues could be easily fixed. Wood

responded "I'm not going to keep putting my money in it if someone else is driving. And neither are you because I control your money." Davis, seemingly finding some humor in this, repeatedly asked "You do what?" to which Wood's replies included, "I control your money, that's what . . . You heard me, and you know it . . . So does everybody else. . . Ain't [sic] no other bitch going to do anything like I've done."

**{¶ 6}** The Fayette County Grand Jury indicted Davis for three counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) and (C)(1)(d),(e), and (f). The grand jury indicted the first count as a second-degree felony, the second count as a first-degree felony, and the third count as a first-degree felony with a "major drug offender" specification.[2] The grand jury also indicted Davis for engaging in a pattern of corrupt activity ("EPCA") in violation of R.C. 2923.32(A)(1) (a first-degree felony).

**{¶ 7}** Davis pled not guilty to the charges in the indictment. During subsequent proceedings, Davis filed a pro se motion to suppress, arguing the CI's recordings were warrantless searches and violated state and federal laws prohibiting wiretapping. The trial court denied the motions to suppress, finding that the CI was a welcome and "expected guest" of Wood's and that Davis had no reasonable expectation of privacy because the CI was an active participant in the phone calls. The CI's recordings were later admitted into evidence at trial.

**{¶ 8}** Citing the prejudicial nature of such information, Davis objected to any mention during trial that he was in prison at the time of his offenses. This objection focused largely on the prison's recorded phone calls because the prison's automated system made clear that the calls were made from prison. The trial court allowed the

---

2. The meaning and significance of the specification and other relevant statutes discussed in this background will be discussed in more detail below.

- 4 -

recordings to be played, but ruled no reference could be made to the fact Davis was in prison "short of Brandi Wood's testifying to that effect . . ."

{¶ 9} The court gave the State time to identify parts of recordings where the prison call automated systems could be heard so that they could be removed or not played for the jury. However, the very first call played for the jury included automated audio stating the call was made from a correctional institution. Davis' counsel objected, and the Court immediately instructed the jury to "disregard [the audio] until we get this thing playing correctly. Make no, take no consideration of things you hear until we get it working."

{¶ 10} Wood testified at Davis' trial. She asserted that the methamphetamine was solely hers, that she sold it to support her personal drug habit, and that Davis received no money from her sale of the drugs. Wood also stated she had Davis on speakerphone during her deals with the CI because Wood "wanted [Davis] to . . . say that we was [sic] working, that I was working for the cartel and he was involved in it" so that the CI would not try to rob Wood.

{¶ 11} During cross-examination, the State sought to establish the nature of her and Davis' relationship, and the following exchange took place:

State: How did you and Chad meet?

Wood: My brother was in prison with him.

State: He was what?

Wood: My brother was in prison with him.

Davis' counsel objected. After a sidebar with the trial judge, Wood's cross-examination continued, but the topic of how Davis and Wood met was dropped.

{¶ 12} Davis' counsel later moved for a mistrial, arguing that the improper phone

recording evidence and the State's questioning of Wood, both of which indicated that Davis was in prison, were prejudicial. Davis' counsel remarked that "it had to be anticipated that [Wood and Davis] had met . . . while he was in prison . . . " making the line of questioning inappropriate. The trial court denied the motion for a mistrial.

{¶ 13} The State called on Suzanne Elliot to testify. At the time of the underlying law enforcement investigation, Elliot was a trace evidence examiner and forensic scientist for the Ohio Bureau of Criminal Investigation. Elliot testified that lab tests she conducted confirmed that the packaged substances the CI received from Wood's apartment were methamphetamine. Reports authored and signed by Elliot in January of 2023 that documented the results of her testing were also admitted into evidence. Davis' counsel objected to both Elliot's testimony and the admission of the reports, arguing that Elliot's report and an accompanying notarized statement about the report were not provided to him until trial, violating R.C. 2925.51. The trial court overruled the objection.

{¶ 14} After the State finished presenting evidence, Davis moved to dismiss the case under Crim.R. 29, but the judge denied the motion.

{¶ 15} The jury found Davis guilty on all counts. After trial, Davis filed pro se motions to terminate his court appointed counsel and for a new trial on various grounds: (1) the evidence was insufficient to support the guilty verdicts; (2) the State's introduction of evidence of Davis' imprisonment violated the trail court's order; (3) the trial court improperly admitted Elliott's testimony and lab reports after the State failed to comply with R.C. 2925.51(A) and (B); and (4) admission of "testimonial" statements from the CI was in error because the CI was not presented as a witness subject to cross-examination. The trial court also denied this motion.

{¶ 16} Davis was sentenced to an aggregate mandatory prison term of 27 to 32

and one-half years, served consecutively to the prison term he was already serving. The trial court also found that Davis was a major drug offender ("MDO") under R.C. 2941.1410(A). The trial court found Davis to be an MDO. The MDO issue was not submitted to the jury.

{¶ 17} Davis now appeals. We will address Davis' assignments of error chronologically, as they allegedly occurred during the trial.

## II. Analysis

### Fourth Assignment of Error

THE TRIAL COURT ERRED WHEN IT DENIED THE MOTION TO SUPPRESS

### A. Standard of Review and Applicable Law

{¶ 18} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact." *State v. Gray*, 2012-Ohio-4769, ¶ 15 (12th Dist.). Recognizing that trial courts are in the "best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility," appellate courts must accept the factual findings of the trial court "if they are supported by competent, credible evidence." *State v. Hensgen*, 2017-Ohio-8793, ¶ 16 (12th Dist.). If the factual findings are supported, "the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Burnside*, 2003-Ohio-5372, ¶ 8.

{¶ 19} Both Section 14, Article I, of the Ohio Constitution and the Fourth Amendment to the United States Constitution prohibit warrantless searches by law enforcement. However, Ohio law has held for over 40 years that "the warrantless recording of a telephone conversation between a consenting police informant and a non-consenting defendant does not offend" either constitution or applicable statutes. *State v.*

*Geraldo*, 68 Ohio St.2d 120, 124 (1981). *See also State v. Wallace*, 2012-Ohio-6270, ¶ 29, 43 (7th Dist.).

## B.  Analysis

**{¶ 20}** Here, Davis argues on appeal, as he did at the trial level, that the calls recorded by the CI should have been suppressed because the CI "was never a participant in the conversation with [him]" and because he "had a reasonable expectation of privacy speaking to his girlfriend who was in her private home." While Davis' brief cites relevant authorities, including the state and federal constitutions, it does not analyze this weighty legal issue with any specificity, instead asserting it was "briefed at length in the trial court in appellant's [pro se] motion to suppress which is incorporated herein by reference as if fully rewritten."

**{¶ 21}** Appellants must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary." App.R. 16(A)(7). An appellant's failure to comply with this rule can have severe consequences, including this court disregarding or overruling the relevant assignment of error. App.R. 12(A)(2).[3]

**{¶ 22}** Arguments cannot be incorporated by reference. *State v. Keeton*, 2023-Ohio-2520, ¶ 27 (12th Dist.), citing *Ebbing v. Lawhorn*, 2012-Ohio-3200, ¶ 31 (12th Dist.). "It is not an appellate court's duty to 'root out' or develop an argument that can support

---

3. The tendency for the court to disregard undeveloped arguments might be stronger in cases, like this one, where a litigant is granted leave to submit an oversized brief and proceeds to include multiple block quotes (with one taking multiple pages). *See. e.g.,* Appellant's Br., 30-33. Summarizing law accurately to comply with page limits is one of a legal writer's best tools to gain proficiency in preserving space for the most important arguments.

an assignment of error, even if one exists." *Rathert v. Kempker*, 2011-Ohio-1873, ¶ 12 (12th Dist.), quoting *Hausser & Taylor, LLP v. Accelerated Systems Integration, Inc.*, 2005-Ohio-1017, ¶ 10 (8th Dist.).

{¶ 23} Despite Davis' undeveloped and "incorporated" arguments, we note that several pieces of evidence quickly refute Davis' contentions. First, the CI was clearly an expected and welcomed guest at Wood's home for the purpose of completing drug deals because Wood either let the CI into her residence or did not object to CI letting herself in during visits. *See State v. Baker*, 2024-Ohio-2856, ¶ 14 (12th Dist.) ("There was no objection made by [defendant or his wife] to the CI's entrance into the home as would be expected if [the CI] was an uninvited and unwelcome guest").

{¶ 24} Second, Davis had no reasonable expectation of privacy in his phone calls with Wood because they were made from a recorded line (a fact Davis was notified of every time he placed a call from the prison), and Wood made her call with Davis in the CI's presence public by virtue of having it on speaker phone while making no attempt to keep the conversation private when the CI entered the room. *See United States v. Upton*, 763 F.Supp. 232, 243 (S.D.Ohio 1991) ("Defendants had no reasonable expectation of privacy in the contents of answering machine tapes activated by calls received while the deputies were lawfully on the premises. The speaker on the answering machine was turned on, making incoming calls clearly audible to any person present in the room").

{¶ 25} Third, Davis and the CI undoubtedly engaged in direct conversation through Wood's speakerphone when he explained to the CI what her profit margins would be, their discussion regarding splitting costs on a future bulk purchase of methamphetamine, or when the CI asked Davis specifically for a "friends and family" discount. Though much of Davis' time on the phone was spent in silence while Wood and the CI spoke, nothing

in the record demonstrates he did not know the CI was there or that at any point he asked the CI to leave after the two spoke with each other.

**{¶ 26}** The trial court made no errors of fact or law in denying Davis' motion to suppress, and this assignment of error is overruled.

### Third Assignment of Error

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT
DENIED THE MOTION FOR A MISTRIAL.

### A. Standard of Review

**{¶ 27}** "A trial court should not grant a motion for a mistrial unless it appears that some error or irregularity has been injected into the proceeding that adversely affects the substantial rights of the accused, and as a result, a fair trial is no longer possible." *State v. Thornton,* 2009-Ohio-3685, ¶ 11 (12th Dist.), citing *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2nd Dist.); *State v. Crane*, 2014-Ohio-3657, ¶ 30 (12th Dist.). "Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *State v. Jones*, 2020-Ohio-3051, ¶ 18.

**{¶ 28}** We review a trial court's denial of a mistrial for an abuse of discretion. *Crane* at ¶ 30, quoting *State v. Motz,* 2010-Ohio-2170, ¶ 12 (12th Dist.). An abuse of discretion occurs when the trial court's "attitude is unreasonable, arbitrary, or unconscionable." *State v. Hancock*, 2006-Ohio-160, ¶ 130.

### B. Analysis

**{¶ 29}** Davis argues that the State's actions at trial reek of foul play after counsel and the court went through great lengths to create a plan to prevent Davis' incarceration from becoming known to the jury. We conclude, however, the trial court did not abuse its discretion in denying Davis' motion for a mistrial.

**{¶ 30}** As to the prison references in the jail phone call recordings, courts have

consistently held that "[c]urative instructions 'are presumed to be an effective way to remedy errors that occur during trial.'" *State v. Tyree*, 2017-Ohio-4228, ¶ 16 (12th Dist.), quoting *State v. Trzeciak*, 2015-Ohio-2219, ¶ 24 (12th Dist.); *see also State v. Loza*, 71 Ohio St.3d 61, 79 (1994).[4]

**{¶ 31}** Davis argues the trial court's instruction to simply "disregard" what they heard until the recording was playing properly was insufficient. While the trial court may have been able to take stronger remedial measures, nothing in the record suggests that the jury ignored the court's instruction. *Compare State v. Doren*, 2009-Ohio-1667, ¶ 134 (6th Dist.) (reversing a conviction where the jury "demonstrated sustained curiosity" and submitted seven written questions regarding a polygraph test despite being instructed to disregard any mention of polygraph tests).

**{¶ 32}** The State asked Wood where she met Davis, and she answered that she met him while he was in prison with her brother. Davis argued the State knew this question would bring out testimony regarding his incarceration because Davis had been incarcerated the whole time Wood knew Davis. The State, however, contends it had no idea how Wood met Davis, and argues that Wood, via counsel, should have known about Davis' motion in limine and the court's subsequent prohibition of referring to the fact that Davis was in prison. Neither party points to any part of the record to substantiate their arguments.

**{¶ 33}** We do not find the trial court abused its discretion when it denied Davis' motion for a mistrial. While the references to Davis' incarceration via the recording did not comply with the court's orders, the court promptly and justifiably gave the jury a curative

---

4. As the United States Supreme Court has observed, "Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed."` *Parker v. Randolph*, 442 U.S. 62, 73 (1979), *abrogated on other grounds by Cruz v. New York*, 481 U.S. 186 (1987).

instruction. Davis provides no support from the record for his contention that the State intentionally violated the court's order when it asked where Wood met Davis. In addition, the trial court ruled before trial that, "short of Brandi Wood's testifying to that effect. . ." no reference should be made to the fact Davis was in prison. Upon review, the State's questioning of Wood about her relationship with Davis was not so pointed that she was forced to answer she met him at prison.

**{¶ 34}** We conclude these issues at trial, while perhaps preventable, did not ultimately affect the trial's outcome. As discussed in more detail below regarding Davis' first and second assignments of error, "the [S]tate presented ample evidence to support the charges of which [Davis] was convicted" and no prejudicial error occurred. *State v. Crane*, 2014-Ohio-3657 ¶ 32 (12th Dist.). *Compare Doren*, 2009-Ohio-1667 at ¶ 136 (the State's evidence was "thin and rife with inconsistencies," increasing the "damage" caused by impermissible reference to polygraph tests).

**{¶ 35}** This assignment of error is overruled.

### Fifth Assignment of Error

THE TRIAL COURT ERRED WHEN IT ADMITTED THE DRUG LABORATORY REPORTS AND PERMITTED THE RELATED TESTIMONY IN VIOLATION OF O.R.C. §2925.51 (A) AND (B).

### A. Standard of Review and Applicable Law

**{¶ 36}** Compliance with R.C. 2925.51 is a statutory matter, not a discovery issue. *State v. Saleem*, 2024-Ohio-3162, ¶ 29 (1st Dist.), *State v. Bethel*, 2002-Ohio-5437, ¶ 9 (5th Dist.), *State v. Bates*, 2004-Ohio-2219, ¶ 9 (3rd Dist.). Whether or not the parties followed proper procedure under a statute is a matter of statutory interpretation, making our review de novo. *Ohio Patrolmen's Benevolent Assn. v. Cleveland*, 2024-Ohio-2651, ¶ 9.

- 12 -

**{¶ 37}** Under R.C. 2925.51(A), lab reports from qualifying facilities showing results as to the "content, weight, and identity of [tested] substance[s] and that it contains any amount of a controlled substance and the number and description of unit dosages, is prima-facie evidence of the content, identity, and weight or the existence and number of unit dosages of the substance." A notarized statement by the signer of the report which verifies various aspects of the report and gives an outline of the signer's "education, training, and experience for performing the analysis" must be attached to the report. *Id.* The prosecuting attorney must serve a copy of the report and the notarized statement on the attorney of record for the accused prior to "any proceeding in which the report is to be used against the accused [with certain exceptions]." *Id.* at (B). After receiving the report, a defendant has seven days to demand testimony from the individual who wrote the report. *Id.* at (C). If testimony is requested by the defendant, the report does not constitute prima-facie evidence. *See id. In re Bennett*, 134 Ohio App.3d 699, 701-02 (12th Dist. 1999).

**{¶ 38}** Ohio courts have consistently held that because "the statute specifically lists what must be included with the report . . . Failure to include all information specified in the statute renders the report inadmissible at trial . . ." *Bethel* at ¶ 9. *See also Saleem* at ¶ 29*,* quoting *Bates* at ¶ 9; *State v. Adkins*, 2020-Ohio-535, ¶ 19 (12th Dist.). Nonetheless, even if a report is mistakenly admitted into evidence, such error can be harmless if cumulative evidence supporting the conviction, such as testimony from the individual who wrote the report, is properly admitted at trial. *See Bates* at ¶ 9; *State v. Clark*, 1991 WL 129794, *3 (12th Dist. July 15, 1991); *State v. Stephens*, 126 Ohio App.3d 540, 552 (1st Dist. 1998).

## B. Analysis

{¶ 39} Put simply, we conclude the trial court erred in admitting Elliot's reports because they were not timely sent to Davis' counsel and not accompanied by the required notarized statement. However, such error was harmless because Elliot, the forensic scientist who performed the relevant analysis, testified as to the contents of the reports at trial. Elliot's direct testimony provided evidence as to the content, weight, and identity of the controlled substance (methamphetamine) supporting Davis' conviction—the report was unnecessary to establish the evidence of the relevant facts.

{¶ 40} This assignment of error is overruled.

### First Assignment of Error

THE VERDICT WAS BASED ON INSUFFICIENT EVIDENCE AND/OR WAS
CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE
AND THE TRIER OF FACT CLEARLY LOST ITS WAY.

### Second Assignment of Error

THE TRIAL COURT ERRED WHEN IT DENIED
THE MOTION FOR ACQUITTAL.

## A. Standard of Review

{¶ 41} "A manifest weight of the evidence challenge examines the 'inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *State v. Madden*, 2024-Ohio-2851, ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

- 14 -

{¶ 42} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 14 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 43} Under Crim.R. 29(A), a defendant may be acquitted at trial by the court "if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, appellate courts review the denial of a motion for acquittal under the same standard as that used to review a sufficiency-of-the-evidence claim. *State v. Maloney*, 2023-Ohio-2711, ¶ 40 (12th Dist.), citing *State v. Mota*, 2008-Ohio-4163, ¶ 5 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Madden* at ¶ 31, citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 44} "[A]lthough the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency'" as well as Crim.R. 29. *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

## B. Trafficking in Drugs, Complicity

### 1. Applicable Law

{¶ 45} Trafficking in drugs occurs when one "knowingly . . . [s]ell[s] or offer to sell a controlled substance or a controlled substance analog[.]" R.C. 2925.03(A)(1). In turn, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). When the illegal drugs involved is between 50 and 100 times the bulk amount, "the court shall impose . . . a first degree felony mandatory prison term." R.C. 2925.03(C)(1)(e).

{¶ 46} Individuals can be found guilty of being complicit when they "supported, assisted, encouraged, cooperated with, advised, or incited the principal [offender] in the commission of the crime, and . . . shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. Importantly, "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F). As a result "an accomplice to the offense can be prosecuted and punished as if the accomplice was the principal offender." *State v. Spencer*, 2017-Ohio-456, ¶ 53 (4th Dist.), citing *State v. Tumbleson,* 105 Ohio App.3d 693, 697 (12th Dist. 1995). "Aiding and abetting may be shown through either direct or circumstantial evidence, and participation in criminal intent may be inferred from the presence, companionship, and conduct before and after the offense is committed." (Cleaned up.) *State v. Fletcher*, 2017-Ohio-1006, ¶ 53 (12th Dist.).

### 2. Analysis

{¶ 47} Davis argues that the act of trafficking in drugs "was complete when Ms.

Wood offered to sell the CI methamphetamine in the prearranged deals for agreed-upon quantities and agreed-upon prices." As a result, Davis asserts he cannot be guilty of trafficking in drugs, or complicit in such trafficking, because the deals were already arranged and completed before the CI even entered Wood's home and could hear Davis on speakerphone. Davis thus claims there was no evidence he was involved in the making of these deals. Davis also complains that the trial court erred in giving a complicity jury instruction as to the trafficking charges because the indictment charged him as a principal offender and he had no notice that the State was pursuing a complicity theory of criminal liability.

**{¶ 48}** We address Davis' complicity argument first. As stated above, R.C. 2923.03(F) expressly allows for a charge of complicity to be stated in terms of the principal offense. Such was the case here, meaning the indictment was not defective in charging Davis, and the State could pursue a theory of complicity at trial and ask for a complicity jury instruction.

**{¶ 49}** Davis' arguments disavowing trafficking ignore evidence such as (a) Wood asking Davis what he was charging the CI per ounce/pound of methamphetamine, (b) Davis discussing with Wood how many pounds/half pounds of drugs "we"—Davis and Wood—had left, and (c) Davis discussing with the CI the good, tested quality of the methamphetamine, how much to sell it for to maximize profits, and the possibility of cost sharing a future bulk purchase. The CI also expressly said to Davis, not Wood, that the CI wanted a "friends and family" discount on future deals. It was well within reason for the jury to conclude from such evidence that Davis was not only aware Wood was selling bulk amounts of methamphetamine, but actively supported, assisted, cooperated, and advised her in such sales.

### C. Engaging in a Pattern of Corrupt Activity - EPCA Offense

#### 1. Applicable Law

{¶ 50} R.C. 2923.32(A)(1) provides that, "[n]o person . . . associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity . . ." As applicable to this appeal, R.C. 2923.31(C) defines an "enterprise" as any "illicit" or "licit" undertaking carried out by "any individual . . . partnership . . . or group of persons associated in fact although not a legal entity." "Corrupt activity" includes trafficking in drugs, and a "pattern of corrupt activity" occurs when there are "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E), (I)(2)(c).

{¶ 51} A criminal enterprise "must have three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." (Cleaned up.) *State v. Sparks*, 2014-Ohio-1130, ¶ 20 (12th Dist.). As to the longevity element of an "enterprise," the Supreme Court has observed that "nothing in the statutes or caselaw pertaining to the definition of 'enterprise' in R.C. 2923.31(C) specifies a time duration." *State v. Dent*, 2020-Ohio-6670, ¶ 21. As a result, we must "determine whether the evidence, when viewed in the light most favorable to the prosecution, is sufficient to allow a rational juror to conclude that the enterprise here had longevity sufficient to permit appellees to pursue the enterprise's purpose." *Id.*

#### 2. Analysis

{¶ 52} Davis asserts that there was insufficient evidence that he was associated

- 18 -

with an "enterprise" and argues that he was not present for any of the drug transactions, never received any of the proceeds of the drugs sales, and that the sales supported only Wood's drug habit. Davis also contends that any purported enterprise lacked the necessary longevity for corrupt activity because the State only presented evidence of three drug transactions, two of which occurred on the same day and the third only a week later.

{¶ 53} Davis is correct that direct evidence of drug sales in this case is limited to the span of a week. However, various pieces of evidence support the jury's findings of purpose, relationship, and longevity necessary to deem Davis' and Wood's activity a criminal enterprise, including (a) Davis' assertion to the CI that "everything we get is tested," (b) Wood's statement that she was going to tell the CI to "do it like we do it" because the CI's profits were "terrible" according to Davis, and (c) Wood's statement that she "control[ed]" Davis' money and that no other woman would do for him what she had done.

{¶ 54} The jury could have inferred multiple things from the circumstantial evidence such as these statements: (a) Davis and Wood sought to sell drugs to make money—*purpose*; (b) Davis and Wood, who were already in a romantic relationship and engaged, worked closely together to sell drugs, and Wood "controlled" Davis' money from the sale of drugs—*relationship*; and (c) Davis and Wood worked together long enough to develop a detailed system wherein they procured, carefully evaluated via testing, and strictly priced their drugs to maximize profits—*duration* (such systems are likely not developed overnight or within the span of a week). *Compare State v. Sparks*, 2014-Ohio-1130, ¶ 26 (12th Dist.) (defendant was not associated in an enterprise that included three other individuals because all parties were acting in furtherance of their individual interests as

- 19 -

opposed to promoting a common purpose).

**{¶ 55}** We conclude Davis' convictions for three counts of trafficking in drugs and engaging in a pattern of corrupt activity were not against the manifest weight of the evidence, meaning the evidence was also sufficient to sustain a conviction and withstand Davis' motion for acquittal.

**{¶ 56}** These two assignments of error are overruled.

### Sixth Assignment of Error

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT
DENIED APPELLANT'S MOTION FOR A NEW TRIAL.

### A. Applicable Law and Standard of Review

**{¶ 57}** A new trial may be granted if a defendant demonstrates that any of the following causes materially affected his "substantial rights":

> (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
>
> (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
>
> (3) Accident or surprise which ordinary prudence could not have guarded against;
>
> (4) That the verdict is contrary to law;
>
> (5) Error of law occurring at the trial;
>
> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.

Crim.R. 33(A).

**{¶ 58}** "The decision to grant or deny a motion for a new trial pursuant to Crim.R. 33 rests within the sound discretion of the trial court and will not be reversed absent an

abuse of discretion." *State v. Marshall*, 2024-Ohio-4445, ¶ 22 (12th Dist.). Again, an abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Hancock*, 2006-Ohio-160 at ¶ 130.

## B. Analysis

**{¶ 59}** Davis argues on appeal, like at the trial level, that he was entitled to a new trial due to a litany of issues, most of which are raised in his other assignments of error discussed above.[5] We will not rehash our analysis on those issues here.

**{¶ 60}** However, Davis also asserts on appeal, for the first time, that the State engaged in misconduct during closing arguments, invoking Crim.R. 33(A)(2), by stating Davis "helped to arrange the deal and helped to sell" methamphetamine and that Wood was "funneling" drug money to Davis. Davis argues these are misstatements because Wood denied Davis' involvement and the State presented no evidence that Davis received drug money.

**{¶ 61}** Because there was no objection at trial to the prosecutor's closing arguments, Davis has forfeited all but "plain error," an obvious error in the trial proceedings that affected that party's "substantial rights" and "affected the outcome of the trial.'" *State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Baker*, 2024-Ohio-2856, ¶ 39 (12th Dist.). Similarly, "[t]he test for prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the defendant. *Id.* at ¶ 38.

---

5. *E.g.* The evidence was insufficient to support the jury's guilty verdicts, the court erred in allowing a complicity instruction for the trafficking in drugs charges, and improper evidence was introduced at trial (mention of Davis' imprisonment, Elliott's testimony and report concerning the drug analysis, and the CI's recordings of Davis' "private" phone calls, etc.).

**{¶ 62}** Davis' briefing makes no reference to and does not seek to apply either of these two standards. He simply concludes these "misstatements" amount to misconduct and merit a new trial. Again, App.R. 16(A)(7) requires reasoning in support of an assignment of error, complete with citations to authorities, statutes, and parts of the record relied upon. If a party fails to properly identify and argue an assignment of error, an appellate court may disregard it. App.R.12(A)(2). As previously noted by this court, "[i]t is not the obligation of the appellate court to search the record for evidence to support an appellant's argument as to any alleged error." *State v. Bowling*, 2024-Ohio-1638, ¶ 4 (12th Dist.).

**{¶ 63}** Nonetheless, a cursory review leads us to conclude the prosecutor's statements were not improper (and thus not prejudicial) because the assertion that Davis "helped" Wood arrange for and sell methamphetamine is consistent with the State's complicity theory at trial. Further, though not specifically argued by the State at trial, Wood's statement over the phone that she controlled Davis' money can reasonably be seen as evidence that Wood used or "funneled" profits from their joint enterprise to Davis' benefit. The prosecutor's statements did not constitute error—plain or otherwise. The statements did not misstate evidence but simply argued that Wood's testimony was not credible.

**{¶ 64}** Ultimately, this was an issue for the jury to decide. Given the quantity and weight of the evidence presented at trial and analyzed throughout this opinion, the trial court did not abuse its discretion when it denied Davis' motion for a new trial. Likewise, the prosecutor's statements at closing were not plain error, but proper arguments related to witness credibility. The evidence Davis presents does not support his allegation of prosecutorial conduct.

**{¶ 65}** We overrule this assignment of error.

**Seventh Assignment of Error**

THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT DISPROPORTIONATELY TO OTHER DEFENDANTS AND INCLUDED A MAJOR DRUG OFFENDER ENHANCEMENT.

**A. Compliance with R.C. 2929.11 and 2929.12**

**1. Applicable Law and Standard of Review**

**{¶ 66}** R.C. 2929.11 embodies the "overriding purposes of felony sentencing" and requires that sentences protect the public, punish an offender, and promote the rehabilitation of the offender. The statute also requires that imposed sentences balance the seriousness of the crime with its impact on a victim and be consistent with sentences imposed on similar crimes and offenders. *Id.* at (B). In turn, R.C. 2929.12 gives the trial court discretion on how to balance and comply with these overriding purposes while considering various factors regarding the seriousness of the crime and an offender's risk of recidivism, including whether the offender had a criminal history and whether the offense was committed "as a part of an organized criminal activity." *State v. Johnson*, 2024-Ohio-3237, ¶ 7 (12th Dist.), R.C. 2929.12.

**{¶ 67}** To prevail on an appeal relating to R.C. 2929.11 and 2929.12, an appellant must present clear and convincing evidence that the sentence is "otherwise contrary to law" under R.C. 2953.08(G)(2)(b). *State v. Iverson*, 2023-Ohio-1601, ¶ 40 (12th Dist.). A sentence is not "'clearly and convincingly contrary to law'" if the trial court considers the principles and purposes of felony sentencing and the sentencing factors, but the trial court is not required to make any specific factual findings on the record. *State v. Murphy*, 2025-Ohio-63, ¶ 15-16 (12th Dist.), quoting *State v. Clinger*, 2022 Ohio 3691, ¶ 39, citing *State v. Bryant*, 2022-Ohio-1878, ¶ 20. An appellate court does not have the authority to

- 23 -

independently weigh the sentencing factors and substitute its judgment for that of the trial court's. *State v. Jones*, 2020-Ohio-6729, ¶ 42.

## 2. Analysis

{¶ 68} Davis first argues his sentence "was not commensurate with [the] seriousness of the offense" and not consistent with sentences imposed for similar crimes committed by similar offenders.[6] Davis identifies multiple Fayette County cases where defendants were given lesser sentences than Davis despite there being greater amounts of drugs involved or other aggravating factors. *See e.g. State v. Adkins*, 2020-Ohio-535, ¶ 30 (12th Dist.) (defendant sentenced to 20 years for trafficking in more than 100 grams of cocaine and led police on a car chase before being captured).

{¶ 69} But Davis fails to acknowledge the aggravating factors present in his own case. The quantities of methamphetamine involved in the three separate transactions—27.91 grams, 198.43 grams, and 448.17 grams—exceeded five times the bulk amount (a second-degree felony under R.C. 2925.03(C)(1)(d), 50 times the bulk amount (a first-degree felony under R.C. 2925.03(C)(1)(e), and 100 times the bulk amount (a first-degree felony under R.C. 2925.03(C)(1)(f). In addition, Davis was participating in this corrupt enterprise while imprisoned. The fact that the trial court did not give Davis the *same* sentence as other MDO offenders does not mean the trial court did not comply with applicable sentencing rules. *See State v. Micomonaco*, 2012-Ohio-5239, ¶ 49 (12th Dist.) ("Consistency in sentencing . . . does not mean uniformity").

{¶ 70} Indeed, "[a] consistent sentence is not derived from a case-by-case comparison, but from the trial court's proper application of the statutory sentencing

---

6. Davis also argues that "there was some indication that the sentence sought and impose was vindictive as a trial tax." Pursuant to App.R. 12(A)(1)(b) and App.R. 16(A)(7), we do not address this undeveloped claim.

guidelines." *Id.* Davis makes no argument that the trial court failed to properly consider R.C. 2929.11's purposes and principles of felony sentencing or R.C. 2929.12's seriousness and recidivism factors. We therefore cannot conclude that the trial court's sentence was disproportionate.

### B. Major Drug Offender ("MDO") Determination

### 1. Applicable Law

{¶ 71} Ohio law generally requires that an MDO determination be preceded by the inclusion in the indictment of an MDO specification. *See generally* R.C. 2941.1410. However, the statute expressly states that R.C. 2925.03 ("Trafficking offenses") is exempted and subject to its own requirements for a MDO specification. *Id.*

{¶ 72} Trafficking in Schedule II drugs, including methamphetamine, results in differing penalties depending on the amount of the drug at issue. *See generally* R.C. 2925.03(C); Adm.Code 4729:9-1-02(C)(2). The bulk amount for methamphetamine is three grams. R.C. 2925.01(D)(1)(g). "If the amount of the drug involved equals or exceeds one hundred times the bulk amount . . . aggravated trafficking in drugs is a felony of the first degree, [and] the offender is a major drug offender . . ." R.C. 2925.03(C)(1)(f).

{¶ 73} In such cases, "the court shall impose as a mandatory prison term a maximum first-degree felony mandatory prison term." *Id.* Thus, a jury finding that the amount of the drug involved exceeds one hundred times the bulk amount subjects an offender to treatment as an MDO. *State v. Hooks*, 2022-Ohio-4132, ¶ 16 (12th Dist.).

### 2. Analysis

{¶ 74} Davis argues that the trial court's finding he is an MDO denied his right to a jury trial on that issue. But the jury specifically found under count three, which included an MDO specification, that the amount of methamphetamine exceeded 100 times the bulk

amount. Therefore, the jury made the necessary findings for Davis to be deemed an MDO under Ohio law. *See id.* Stated differently, Davis must be deemed a major drug offender under R.C. 2925.03(C)(1)(f) because the jury determined the weight of the methamphetamine at issue was within the range identified by the statute. The statute does not provide the court (or a jury) with discretion to conclude otherwise. *Id.*

**{¶ 75}** This assignment of error is overruled.

### Eighth Assignment of Error

DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL BY AN IMPARTIAL JURY, AND EFFECTIVE ASSISTANCE OF COUNSEL.

**{¶ 76}** Finally, Davis asserts his trial counsel was constitutionally ineffective by failing to (1) seek dismissal of the indictment for insufficiency (although counsel did move for a judgment of acquittal at the close of the State's case), (2) seek removal of a juror who had worked in a prison and knew some of the State's witnesses, (3) file a motion to suppress (although Davis filed a pro se motion to suppress which the trial court considered and denied), (4) object to "misstatements" during the State's closing arguments, (5) object to a reference by the State to Wood's no contest plea during trial, (6) object to a complicity jury instruction, and (7) object to the trial court's imposition of an MDO prison term on the third count of the indictment.

**{¶ 77}** To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Courts determine deficient performance by asking whether counsel's conduct "fell below an objective standard of reasonableness" based on "the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 688, 690. In turn, prejudice is shown

where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A defendant's failure to sufficiently show either *Strickland* prong is fatal to a claim of ineffective assistance. *State v. Lloyd*, 2022-Ohio-4259, ¶ 31, citing *Strickland* at 697.

**{¶ 78}** There are multiple issues with Davis' final assignment of error. Firstly, the purported issues raised are largely duplicative of arguments contained under previous assignments of error (all of which have been overruled), and Davis provides little to no further analysis under this final assignment of error. In addition, while Davis states the standard by which ineffective assistance of counsel is to be judged, he does not apply the standard to any of the issues he raises.

**{¶ 79}** Stated differently, Davis does not show how the identified conduct by his counsel was deficient or how he was prejudiced by such conduct. As stated above, we will not attempt to discern these purported issues for him. App.R. 16(A)(7), and 12(A)(2); *Bowling*, 2024-Ohio-1638 at ¶ 4.

**{¶ 80}** Davis also argues that his convictions should be reversed due to cumulative error. "Under the doctrine of cumulative error[ ], a reviewing court 'will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal.'" *State v. Akladyous*, 2023-Ohio-3105, ¶ 60 (12th Dist.), quoting *State v. Kirkland*, 2014-Ohio-1966, ¶ 140. "The cumulative error doctrine is inapplicable when there are not multiple instances presented of harmless error." *State v. Froman*, 2022-Ohio-2726, ¶ 200 (12th Dist.), citing *State v. Garner*, 74 Ohio St.3d 49, 64, 1995-Ohio-168.

**{¶ 81}** Here, we have found no prejudicial errors and only one harmless error—admission of Elliot's report into evidence. One harmless error alone is not sufficient to

support a finding of cumulative error. As a result, Davis cannot demonstrate cumulative error.

**{¶ 82}** Davis' final assignment of error is overruled.

### III. Conclusion

**{¶ 83}** At the end of the day, Davis was entitled to a fair trial, not a perfect one. *State v. Carpenter*, 2023-Ohio-2523, ¶ 95 (12th Dist.), citing *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990); *United States v. Hasting*, 461 U.S. 499, 508 (1983). We conclude he was given that.

**{¶ 84}** Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.

---

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Fayette County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge

- 28 -