[Cite as *State v. Brock*, 2026-Ohio-2036.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2025-05-027 |
| Appellee, | : | |
| vs. | : | OPINION AND JUDGMENT ENTRY 6/1/2026 |
| COREY D. BROCK, | : | |
| Appellant. | : | |
| | : | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 2024-5060

Brian A. Shidaker, Clinton County Prosecuting Attorney, for appellee.

Hughes Law Office and Kevin D. Hughes; and Ostrowski Law Firm Co., L.P.A. and Andrea G. Ostrowski, for appellant.

**O P I N I O N**

**SIEBERT, J.**

{¶ 1} Appellant, Corey Brock, appeals his convictions for various offenses, including the murder of Chad Pauley, in the Clinton County Court of Common Pleas. The State alleged that Brock murdered Pauley following a brief altercation, while Brock argued

at trial that Pauley's death resulted from self-defense or was accidental during an attempt to defend himself. On appeal, Brock challenges the weight of the evidence, the admissibility of certain evidence, including alleged hearsay statements and the use of character evidence, as well as other issues concerning a grant of immunity, and the imposition of his prison sentence. Upon review, we find Brock's assignments of error to be without merit and therefore affirm the judgment of the trial court.

## I. Factual and Procedural Background

### A. Death of Chad Pauley and Subsequent Investigation

{¶ 2} In August 2023, Pauley began living in Brock's basement, reportedly due to domestic issues at his own residence. A few days later, Patricia Baker also began staying there with Pauley. The precise sequence of events following Baker's arrival is unclear. Baker testified that she, Pauley, and Kristy Brock (Brock's wife) spent several days in the basement using methamphetamine. Baker described her relationship with Pauley as romantic, though not formally defined, and stated that Pauley was also "friendly" with Kristy. In support of that characterization, Baker testified that she had seen a nude photograph of Kristy on Pauley's cell phone.

{¶ 3} Although Brock and Pauley had been friends, the State alleged that Brock had become angry and suspicious that Pauley was sexually involved with Kristy. Brock, whose narrative shifted over time, told others that his primary concern was Pauley's drug use and trouble with the law.

{¶ 4} On August 27, 2023, Baker testified that she was in the basement with Pauley when she heard three gunshots from upstairs. She soon encountered Brock descending the stairs while holding a small black handgun. Baker stated that Brock ordered her and Pauley to leave the residence before confronting Pauley. According to Baker, Pauley pleaded, "please don't shoot me," to which Brock responded, "I'm not going

to shoot you. I'm going to pistol whip you." Baker then heard the gun discharge during the confrontation and saw Pauley fall backwards.

{¶ 5} Baker fled the residence and contacted Sheena Wallace, who transported her to the "Wallace Compound," a junkyard property where several individuals resided. While there, Baker told multiple individuals that Pauley had been shot. Some of those individuals went to Brock's residence to look for Pauley but were told by Brock that Pauley had run off. Later that evening, Sergeant Jeremy Meehan responded to Brock's residence regarding a missing-person report for Pauley. Brock stated that Pauley had outstanding felony warrants, had left earlier that day, and he had last seen Pauley walking south on State Route 134. Pauley remained missing for several months, during which rumors concerning his disappearance and Brock's possible involvement circulated within the community.

{¶ 6} Almost five months later, law enforcement executed a search warrant at Brock's property and detained him. Brock later admitted that he had a physical altercation with Pauley during which a firearm discharged. He then led officers to the location where he had buried Pauley's body using chains and a backhoe. Pauley's remains were subsequently recovered.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*B. Summary of Charges, Convictions, and Sentencing*

{¶ 7}    Following a jury trial, Brock was convicted and sentenced as follows:

| Count | Offense, Statute, Offense Level | Verdict | Sentence/ Merger | Consecutive |
|---|---|---|---|---|
| 1 | Felonious assault, in violation of R.C. 2903.11(A)(2) [deadly weapon] and (D)(1)(a), a second-degree felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Guilty on Assault and found he had a gun supporting Firearm specification | Assault Merged with Count 4, but 3 years for Firearm specification | Consecutive to 8 and 9 |
| 2 | Murder, in violation of R.C. 2903.02(B) and (D), a special felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Not Guilty | N/A | N/A |
| 3 | Felonious assault, in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a second-degree felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Guilty, but found he did not have gun, so did not support Firearm specification | Merged with Count 4 | N/A |
| 4 | Murder, in violation of R.C. 2903.02(B) and (D), a special felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Guilty (B), but found he did not have gun, so did not support Firearm specification | 15 years– Life | |
| 5 | Murder, in violation of R.C. 2903.02(B) and (D), a special felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Not Guilty | N/A | N/A |
| 6 | Aggravated murder, in violation of R.C. 2903.01(A) and (C), a special felony<br><br>Firearm specification, R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a)(ii) | Dismissed Prior to Trial | N/A | N/A |
| 7 | Gross abuse of a corpse, in violation of R.C. 2927.01(B) and (C), a fifth-degree felony | Guilty | 12 months | Consecutive to Count 1 |
| 8 | Tampering with evidence, in violation of R.C. 2921.12(A)(1) and (B), a third-degree felony | Guilty | 18 months | Consecutive to Count 1 |
| 9 | Tampering with evidence, in violation of R.C. 2921.12(A)(1) and (B), a third-degree felony | Guilty | 18 months | Concurrent to Count 8 |

## II. Jury Trial

### A. Pretrial Motions

{¶ 8}   Prior to trial, the State dismissed Count Six (aggravated murder) and its accompanying firearm specification. The State moved to compel the testimony of Dustin Johnson, a friend of Brock's, asserting that Johnson possessed relevant information regarding Pauley's death.

{¶ 9}   Brock filed notice of his intent to assert a claim of self-defense. In support, he indicated that he would present evidence that Pauley was a "serial and repeated drug offender with a tendency for violence." Brock further alleged that Pauley was known to carry a firearm, had engaged in violent conduct, and had a propensity to carry other weapons. He also asserted that Pauley had an extensive drug-related criminal history, including an indictment as a major drug offender, which the State obtained before learning of Pauley's death.

{¶ 10}  The trial court ruled on the pretrial motions, including the State's later motion in limine to exclude improper character evidence of the victim. As relevant here, the trial court granted the State's request to prohibit testimony or evidence—other than Brock's own testimony—offered to establish the victim's propensity for violence. The court explained that Brock could testify as to his personal knowledge of Pauley's propensity for violence, but excluded testimony regarding matters outside his personal knowledge, such as the outstanding warrants.

### B. Testimony and Evidence

{¶ 11} At the five-day jury trial, the State presented testimony from 16 witnesses, and Brock testified in his own defense.

{¶ 12} Dr. Bradley Lachey of the Montgomery County Coroner's Office testified that he performed Pauley's postmortem examination and determined the cause of death

to be a gunshot wound to the left chest. He explained that the bullet traveled through the lower chest, perforated the diaphragm, and lodged in the thoracic spine. A toxicology screen revealed toxic levels of methamphetamine, though Dr. Lachey noted that decomposition and the lack of available blood limited the precision of the results. He nonetheless concluded that Pauley died from the gunshot wound.

{¶ 13} Baker testified that on August 27, 2023, she was in the basement with Pauley and Kristy Brock when she heard three rapid gunshots from upstairs. Kristy ran upstairs, and Pauley told Baker they needed to leave. Before they could do so, Brock kicked open the basement door and ordered everyone to leave. As Baker went upstairs, she observed Brock descending the stairs with a firearm. She testified that Brock grabbed Pauley, who pleaded "please don't shoot me," and Brock responded, "I'm not going to shoot you, I'm going to pistol whip you." Baker then heard the gun discharge and saw Pauley fall backward.

{¶ 14} Baker testified that she fled the residence and contacted a friend, who picked her up shortly thereafter. She stated that she told several individuals about the shooting but did not initially contact law enforcement because Pauley had instructed her never to involve the police.

{¶ 15} She further testified that she had been using methamphetamine that day, which Pauley had provided, though she denied that he was her dealer. She reiterated that she was romantically involved with Pauley. Regarding the alleged nude photographs of Kristy Brock, Baker testified that she recalled seeing them on Pauley's phone but could not remember how they were transmitted. She testified "I can't remember. I know I saw the picture. It was on his phone, and it was a message. I don't know."

{¶ 16} Steven Lee testified that Baker came to his trailer at the Wallace Compound and told him Pauley had been shot. Over Brock's hearsay objection, the trial court

admitted this testimony as a prior consistent statement. Lee testified that he and Delbert Wallace, Jr. ("Pee Wee") then went to Brock's residence, where Brock stated that Pauley had run off and asked them to remove Pauley's vehicles. Lee further testified that he later ran into Brock on several other occasions and asked him about Pauley. Brock consistently denied shooting him and claimed that Pauley had run off with a group of bikers.

{¶ 17} Sheena Wallace testified that Baker called her in a distressed state and asked to be picked up immediately. Wallace described Baker as panicked and upset. Brock raised only a general objection to this testimony, using language that suggested an intent to challenge its admissibility on the ground that it failed to qualify as an excited utterance. *See State v. Leach*, 2024-Ohio-3145, ¶ 17 (12th Dist.) (defining an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."). The trial court permitted Wallace to recount Baker's statements, in which she described the confrontation and shooting.

{¶ 18} The State presented testimony from multiple law enforcement officers. Sergeant Terreance Meeham testified that the case began as a missing-person investigation. He conducted a welfare check and testified that Brock had told him of an incident that occurred in an upstairs bedroom after he learned Pauley had outstanding warrants. According to Sergeant Meeham, Brock told him that he ordered Pauley to leave the residence and last saw him walking south of State Route 134. The State also introduced an audio recording of a phone call between Sergeant Meeham and Baker, in which Baker described the events that occurred in the basement earlier that day. Brock again objected, arguing that the recording improperly bolstered Baker's credibility through prior consistent statements, but the trial court overruled the objection.

{¶ 19} Sheriff Douglas Estes testified that he executed a search warrant at Brock's residence and that, during the investigation, Brock repeatedly altered his account of Pauley's disappearance. Although Brock initially denied any knowledge of Pauley's whereabouts, he later admitted that Pauley died during a physical altercation and that he buried the body. According to Sheriff Estes, Brock offered multiple, inconsistent explanations, claiming at various times that Pauley had pulled a gun, may have suffered a heart attack, ran away, or that Brock later heard a gun discharge after Pauley had already left. Deputy Charlie Saylor likewise testified that Brock first denied knowing Pauley's whereabouts but later acknowledged a physical confrontation, stating that he had "roughed him up" before Pauley fled.

{¶ 20} Dustin Johnson testified under a grant of immunity. He stated that Brock confided in him that the altercation stemmed from explicit messages exchanged between Pauley and Kristy. According to Johnson, Brock said he went downstairs to confront Pauley and intended to "pistol whip" him and "scare him," but did not indicate that the firearm had gone off. Johnson further testified that he had little additional information, claiming "I didn't want any more information than what he'd already volunteered."

{¶ 21} Detective Karen Abbitt testified that Brock initially denied knowledge of Pauley's death to her but later admitted that he buried the body. She stated that Brock described confronting Pauley in the basement, "chucking" him against a wall, and that the gun discharged.

{¶ 22} During the cross-examination of Detective Abbitt, defense counsel attempted to introduce cellular and social media records purportedly showing that there had been little communication between Kristy and Pauley and the records contained no evidence that Kristy had sent Brock a nude photograph. Defense counsel also attempted to introduce purported Facebook messages from Pauley using the alias "Bill Grippin,"

showing him in holding a large block of methamphetamines and using threatening language. The trial court sustained the State's objection for multiple reasons, including a purported lack of authentication.

{¶ 23} The State also presented forensic evidence from personnel with the Bureau of Criminal Investigation ("BCI"). Special Agent Matthew Austin and forensic scientist Heidi Tinch testified that multiple areas of the basement floor and stairway yielded "presumptive positive" results for blood. Special Agent Austin further testified that a backhoe found on Brock's property also tested "presumptive positive" for blood, and that information obtained during his investigation led to the excavation of Pauley's body.

{¶ 24} After the State rested, Brock moved for acquittal pursuant to Crim. R. 29, which the trial court denied. Brock then testified, offering an alternative account involving alleged threats from two "Mexican gentlemen." He claimed the men approached him at a convenience store and showed him a document containing Pauley's name and address with the word "methamphetamine" written on it. Brock stated that the men then advised him that he needed to get Pauley out "before they come and get him out." Brock testified that he believed the men were affiliated with a Mexican cartel and rushed home to confront Pauley. According to Brock, when he confronted Pauley, Pauley pulled out a firearm, and the gun discharged as Brock grabbed his wrist.

### C. Verdict and Sentence Summary

{¶ 25} As noted in the summary chart, the jury returned a mixed verdict, finding Brock guilty of felonious assault (Count 1) and found he had a gun, supporting the firearm specification, a separate count of felonious assault (Count 3), one count of murder (Count 4), gross abuse of a corpse (Count 7), and two counts of tampering with evidence (Counts 8 and 9). The jury found Brock not guilty of two murder counts (Counts 2 and 5) and found he did not have a gun for the firearm specifications attached to the murder charge in

Count 4 and the felonious assault charge in Count 3. After merging allied offenses, the trial court imposed an aggregate sentence of 20.5 years to life in prison. Brock now appeals, raising eight assignments of error.

### III. Appeal

### A. Sufficiency, Weight, and Inconsistency

{¶ 26} In his first assignment of error, Brock contends the trial court erred in denying both his motion for acquittal and his motion for a new trial. He raises three related claims. First, he argues that the jury returned inconsistent verdicts, entitling him to either an acquittal or a new trial. Brock's second and third arguments are that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

*1. Sufficiency and Manifest Weight of the Evidence*

*Standard of Review*

{¶ 27} "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Davis*, 2025-Ohio-2382, ¶ 43 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 28} A manifest weight of the evidence challenge, by contrast, concerns the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). In resolving such a challenge, a reviewing court must look at the entire record,

weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 29} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.). A determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency. *State v. Reeder*, 2021-Ohio-2988, ¶ 31 (12th Dist.).

*Applicable Law*

*Murder and Felonious Assault*

{¶ 30} Brock was convicted of two counts of felonious assault and one count of murder. The murder statute, in relevant part, provides:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
>
> . . . .

R.C. 2903.02.

{¶ 31} Felonious assault is defined in R.C. 2903.11, which prohibits knowingly causing serious physical harm to another or causing or attempting to cause physical harm by means of a deadly weapon. R.C. 2903.11(A)(1) and (2). A person acts knowingly

- 11 -

when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B); *State v. Haines*, 2022-Ohio-1145, ¶ 35 (12th Dist.).

*Self-Defense*

{¶ 32} In addition to the elements of murder and felonious assault set forth above, the State also had the burden of proving beyond a reasonable doubt that Brock did not act in self-defense. R.C. 2901.05(B)(1). The self-defense statute places the initial burden of production on the defendant to present evidence "that tends to support" a claim of self-defense. *State v. Sturgill*, 2020-Ohio-6665, ¶ 19 (12th Dist.). Accordingly, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *State v. Messenger*, 2022-Ohio-4562, ¶ 25. Once the defendant satisfies this burden, however, the burden of persuasion shifts to the State, which must prove beyond a reasonable doubt that the defendant did not use the force in self-defense. *Sturgill* at ¶ 17.

{¶ 33} This appeal does not concern whether Brock satisfied his initial burden of production, but whether the State proved beyond a reasonable doubt that Brock did not act in self-defense. *See State v. Elam*, 2022-Ohio-1895, ¶ 13 (12th Dist.). The Ohio Supreme Court has instructed that the State's burden to disprove a claim of self-defense is reviewed on appeal under a manifest-weight standard. *Messenger* at ¶ 27.

{¶ 34} As to self-defense, this court has explained that:

> An accused is justified in the use of force against another if (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the accused did not violate any duty to retreat or avoid the danger.

*State v. Byrd*, 2020-Ohio-3073, ¶ 23 (12th Dist.). The elements of self-defense are

cumulative and therefore self-defense is inapplicable to a defendant who fails to satisfy any one element. *State v. McFarland*, 2022-Ohio-2326, ¶ 42 (12th Dist.).

{¶ 35} A subsequent change in Ohio law—the "stand your ground law"—eliminated the duty to retreat before using force in self-defense when a person is in a "place in which the person lawfully has a right to be." R.C. 2901.09(B). Because Brock was lawfully present in his own home, we turn to the remaining elements of self-defense.

{¶ 36} The first element, often described as the "not at fault" requirement, requires that the defendant not be the initial aggressor in the incident. *State v. Turner*, 2007-Ohio-1346, ¶ 23 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979). However, "the first element of a self-defense claim does not require in all situations that the [defendant] must have refrained from throwing the first punch." *State v. Nichols*, 2002-Ohio-415 (4th Dist.); *State v. Gillespie*, 2007-Ohio-3439, ¶ 17 (2d Dist.). Rather, the inquiry focuses on whether the defendant was at fault in creating the situation that gave rise to the affray. *State v. Crawford*, 2024-Ohio-691, ¶ 26 (12th Dist.). This concept extends beyond identifying the initial aggressor and instead examines the conduct leading to the confrontation. *State v. Elam*, 2022-Ohio-1895, ¶ 14 (12th Dist.). In particular, courts consider whether the defendant escalated the encounter, such as by transforming a verbal dispute into a physical altercation or by introducing a weapon into the conflict. *State v. Mitchell*, 2023-Ohio-2604, ¶ 22 (1st Dist.); *State v. Messenger*, 2021-Ohio-2044, ¶ 51 (10th Dist.).

{¶ 37} The second element, i.e., the bona fide belief requirement, contains both objective and subjective components. *State v. Smith*, 2020-Ohio-4976, ¶ 56 (1st Dist.). The defendant must have honestly believed that he was in immediate danger of death or great bodily harm, and that belief must also be objectively reasonable under the circumstances. *Id*. Thus, it is not enough that the defendant subjectively feared harm; that fear must be one a reasonable person would have held under the same conditions. Courts

have consistently held that when a defendant uses deadly force in self-defense, the perceived threat must rise to the level of death or serious bodily harm. *Sturgill*, 2020-Ohio-6665, at ¶ 26; *State v. Sims*, 2005-Ohio-5846, ¶ 16 (8th Dist.).

*Analysis*

{¶ 38} Brock does not dispute that Pauley died following a struggle in the basement. Instead, he contends that he did not possess or control a firearm, emphasizing that the jury found he did not have a gun in the firearm specifications related to Counts 3 and 4. He maintains that Pauley produced the gun and that he did not knowingly discharge it. He further asserts that he acted in self-defense, arguing that he had no duty to retreat in his home and that the State failed to disprove that defense.

{¶ 39} These arguments lack merit. The jury plainly rejected Brock's account and accepted the State's version of events, a determination squarely within its role as factfinder. *State v. McFarland*, 2022-Ohio-2326, ¶ 47 (12th Dist.), citing *State v. Simmons*, 2021-Ohio-3563, ¶ 75 (12th Dist.). The jury was likewise free to disbelieve Brock's claim of self-defense and credit the State's evidence. *See State v. Pittman*, 2021-Ohio-1051, ¶ 19 (9th Dist.).

{¶ 40} The record contains ample evidence supporting the jury's verdict. Baker testified that Brock entered the basement in an agitated and aggressive state while Pauley pleaded with him not to shoot. Although Brock reportedly stated he intended only to "pistol whip" Pauley, Baker testified that she then heard a gunshot and saw Pauley fall backwards. The State also presented testimony from Dustin Johnson, who stated that Brock had told him he intended to scare and pistol whip Pauley after learning that Pauley and Kristy were exchanging explicit messages.

{¶ 41} Brock's own account largely mirrored this sequence of events, though his version of the incident shifted over time. Initially, he claimed Pauley had run off and did

not disclose the shooting or that he had buried Pauley's body. He repeated similar versions of this account to law enforcement until confronted with the imminent use of cadaver dogs, at which point he admitted to an altercation and burial. By trial, however, Brock offered a different explanation, asserting that the incident involved individuals connected to a Mexican cartel and that he acted in self-defense.

{¶ 42} If the jury believed this evidence, the State could have met its burden to prove the relevant charges beyond a reasonable doubt and to defeat at least one prong of Brock's self-defense assertion. Baker testified she heard three gunshots upstairs, she saw Brock aggressively charge down the basement stairs, heard Brock say he was going to pistol whip Pauley, and heard Pauley plead with Brock not to shoot before she heard the gunshot leading to Pauley's death. Brock's aggressive charge down the stairs and his statements about wanting to pistol whip Pauley could serve two purposes within the context of the State's case.

{¶ 43} First, it undermines the claim of self-defense by demonstrating that Brock was at fault in creating the situation that gave rise to the affray. *Byrd*, 2020-Ohio-3073, at ¶ 23 (12th Dist.). If Brock did not charge down the stairs and aggressively confront Pauley, there would have been no "affray" leading to the assault, the gunshot, and Pauley's death. Although Brock suggests that Pauley escalated the situation by introducing the firearm, the jury could reasonably reject that account in light of contrary evidence. *Messenger*, 2021-Ohio-2044, at ¶ 51 (recognizing escalation where a defendant introduced or controls a weapon during a confrontation).

{¶ 44} Moreover, Brock's statements about intending to "pistol whip" Pauley permit the inference that he exercised control over the firearm at some point during the encounter. After all, how can you "pistol whip" someone if you do not have and control a gun? And if Brock controlled the gun enough to have the intention to pistol whip Pauley,

then Brock could not have a "bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger" was shooting Pauley. *Byrd* at ¶ 23. If believed by the jury, this evidence would support the jury concluding the State met its burden to disprove Brock acted in self-defense, by defeating both justification prongs of that defense.

{¶ 45} Second, Baker and Johnson's testimony regarding Brock's statements that he wanted to "scare" and "pistol whip" Pauley and the subsequent altercation could support that Brock knowingly caused or attempted to cause serious physical harm to Pauley, which would satisfy the felonious assault conviction. Brock's murder conviction rested on Brock causing Pauley's death as a proximate result of committing the felonious assault against Pauley.

{¶ 46} The jury was not required to accept Brock's evolving explanations. When conflicting evidence is presented, a conviction is not against the manifest weight of the evidence merely because the jury chose to believe the State's witnesses. *State v. Lunsford*, 2011-Ohio-6529, ¶ 17 (12th Dist.). Here, the jury reasonably credited the State's evidence and rejected Brock's inconsistent accounts. It was free to believe all, part, or none of the testimony presented. *State v. Roberts*, 2021-Ohio-3073, ¶ 23 (12th Dist.).

{¶ 47} After reviewing the entire record, weighing the evidence and inferences, and considering witness credibility, we conclude that the jury did not lose its way. The convictions are supported by sufficient evidence and are not against the manifest weight of the evidence.

*2. Inconsistent Verdicts*

{¶ 48} Brock also argues that the jury returned inconsistent verdicts, and the trial court therefore erred in denying his Crim. R. 29(C) motion for acquittal. In the alternative,

- 16 -

he contends that he was entitled to a new trial because the alleged inconsistency affected his substantial rights.

{¶ 49} As noted above, the jury found Brock guilty one count of felonious assault with a firearm specification (finding Brock had a gun), a separate count of felonious assault, and one count of murder as charged in Count 4 of the indictment. The jury, however, found Brock not guilty of the murder charges set forth in Counts 2 and 5 of the indictment. It also found he did not have a gun for the firearm specifications attached to the felonious assault charge in Count 3 and the murder charge in Count 4.

{¶ 50} Under Crim.R. 29(A), a defendant may be acquitted at trial by the court "if the evidence is insufficient to sustain a conviction of such offense or offenses." Accordingly, appellate courts review the denial of a Crim.R. 29 motion under the same standard applicable to sufficiency-of-the-evidence claims. *State v. Maloney*, 2023-Ohio-2711, ¶ 40 (12th Dist.), citing *State v. Mota*, 2008-Ohio-4163, ¶ 5 (12th Dist.).

{¶ 51} Crim. R. 33(A) sets forth the grounds upon which a trial court may grant a new trial. Such motions, however, "are not to be granted lightly." *State v. Spradlin*, 2017-Ohio-876, ¶ 9 (12th Dist.). The decision to grant or deny a motion for a new trial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Litton*, 2016-Ohio-7913, ¶ 17 (12th Dist.).

{¶ 52} Brock contends that the jury's verdicts are irreconcilably inconsistent. He emphasizes that the jury found him guilty of felonious assault with a firearm specification in Count 1 but found him guilty of felonious assault in Count 3 and murder in Count 4 while finding he did not have a gun for the firearm specifications attached to those counts. According to Brock, because the State's theory was that each offense involved a firearm, the jury could not logically convict him of the underlying offenses while simultaneously finding he did not have a gun for each specific charge with a firearm specification.

- 17 -

{¶ 53} Brock relies on *State v. Koss*, 49 Ohio St.3d 213 (1990). In *Koss*, the defendant was charged with murder with a firearm specification. *Id.* at 213-214. The jury acquitted her of murder, convicted her of voluntary manslaughter, and found her not guilty of the firearm specification. *Id.* at 214. The Ohio Supreme Court found the verdicts inconsistent under those particular circumstances, as the victim's death by gunshot was undisputed and the jury rejected the only means alleged. *Id.* at 219.

{¶ 54} However, *Koss* did not address the Court's earlier decision in *State v. Perryman*, 49 Ohio St.2d 14 (1976), *vacated in part on other grounds*, 438 U.S. 911 (1978). In *Perryman*, the Court held that a principal offense and its accompanying specification are not interdependent. *Id*. at 25-26. A specification is considered only after finding guilt on the underlying offense and does not alter or negate that finding. *Id*. at 26. Thus, an acquittal on a firearm specification does not invalidate a conviction on the principal charge.

{¶ 55} Ohio appellate courts considering *Koss* and *Perryman* together have generally limited *Koss* to its unique facts involving voluntary manslaughter. *State v. Ayers*, 2013-Ohio-5601, ¶ 24 (10th Dist.), citing *State v. Davis*, 2002-Ohio-3046, ¶ 29 (6th Dist.). As the Tenth District explained in *Ayers*:

> "[a]s long as sufficient evidence supports the jury's verdict at issue, other seemingly inconsistent verdicts do not undermine the otherwise sufficient evidence." [citing *State v. Crabtree*, 2010-Ohio-3843, ¶ 19 (10th Dist.)]. "A jury need not deliver rationally consistent verdicts in order for the verdicts to be upheld. . . . As long as sufficient evidence supports the jury's verdict at issue, other seemingly inconsistent verdicts do not undermine the otherwise sufficient evidence." *Id*., citing *Trewartha* at ¶ 15. *See also, State v. Smith*, 2007-Ohio-6772, ¶ 42 (10th Dist.).

*Id*. at ¶ 24.

{¶ 56} Consistent with that reasoning, Ohio courts have repeatedly upheld convictions despite acquittals on accompanying firearm specifications. In *State v. Allen*, 2006-Ohio-6288, ¶ 31-32 (1st Dist.), the court upheld an aggravated burglary conviction despite acquittals on the related firearm specifications. Likewise, in *State v. Glenn*, 2011-Ohio-829, ¶ 71 (1st Dist.), the court affirmed an aggravated robbery conviction after concluding that the underlying offense was not dependent upon a finding of guilty on the firearm specification. Similarly, the Eighth District stated that it has "repeatedly held that a not guilty verdict with regard to a firearm specification is not inconsistent with a guilty verdict for aggravated robbery." *State v. Jackson*, 2018-Ohio-2131, ¶ 8 (8th Dist.), citing *State v. Bradley*, 2021-Ohio-2687, ¶ 25 (8th Dist.).

{¶ 57} Accordingly, a conviction on a principal offense may stand even where the jury acquits on an accompanying specification. Apparent inconsistencies in jury verdicts may reflect compromise, leniency, or confusion, and do not necessarily warrant reversal. *State v. Sanon*, 2023-Ohio-2742, ¶ 35 (1st Dist.). The relevant inquiry remains whether sufficient evidence supports the conviction.

{¶ 58} We already rejected Brock's sufficiency and manifest weight of the evidence arguments against his convictions for felonious assault and murder, while using a firearm. The vast weight of the caselaw supports rejecting Brock's arguments regarding inconsistent verdicts on this basis. But the facts supporting merger on Brock's convictions also logically support finding no inconsistency in these verdicts. The trial court properly merged the convictions for the two counts of felonious assault into Brock's conviction for murder because they all involved similar import, were committed together, and with the same animus or motivation. *See State v. Ruff*, 2015-Ohio-995, ¶ 25. But the trial court did not merge the firearm specification from Count 1 into Brock's conviction for murder. It stands to reason since the conduct supporting all the merged offenses involved a firearm,

one firearm specification would suffice to support the conviction rooted in the use of that firearm.

{¶ 59} Therefore, the jury's findings on certain firearm specifications do not invalidate the guilty verdicts on the underlying offenses. The trial court did not err in denying Brock's motion for acquittal or his motion for a new trial.

### 3. Remaining Arguments

{¶ 60} Finally, Brock raises an additional sufficiency challenge in a single, perfunctory sentence, asserting that "[s]imilarly there was insufficient evidence to support the tampering with evidence counts and the abuse of a corpse finding of guilty."

{¶ 61} App.R. 16(A)(7) requires an appellant's brief to include an argument setting forth the appellant's contentions for each assignment of error, along with "the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 12(A)(2) further provides that an appellate court "may disregard an assignment of error" if the appellant fails to identify the relevant error in the record or fails to separately argue the assignment, as required under App.R. 16(A). *State v. Bowling*, 2024-Ohio-1638, ¶ 3 (12th Dist.).

{¶ 62} Here, Brock offers no developed argument to support his claim. He does not address the elements of the offenses, cite to the record, or provide any legal authority in support of his assertions. Nor does he meaningfully engage with the evidence presented at trial. The record reflects that Brock did not dispute that he buried Pauley in a field behind the residence or that he disposed of the firearm by placing it in the back of Pauley's vehicle. Despite these facts, Brock summarily asserts that his convictions for tampering with evidence and abuse of a corpse are unsupported by sufficient evidence.

{¶ 63} This court will not construct arguments on an appellant's behalf. It is not the role of an appellate court to develop or "root out" arguments that the appellant has failed

to articulate. *State v. Warnock*, 2024-Ohio-382, ¶ 39 (12th Dist.). Because Brock has failed to comply with App.R. 16(A)(7), we disregard this undeveloped claim.

{¶ 64} We overrule Brock's first assignment of error.

### B. Admission of Business Records

{¶ 65} In his second assignment of error, Brock argues the trial court erred by excluding certain documents purportedly obtained from Verizon and Facebook, which he contends were admissible as business records. A trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. *State v. McLaughlin*, 2020-Ohio-969, ¶ 42 (12th Dist.). A reviewing court should not disturb such rulings unless the abuse of discretion resulted in material prejudice. *State v. Boles*, 2013-Ohio-5202, ¶ 14 (12th Dist.). "An abuse of discretion occurs when the trial court is 'unreasonable, arbitrary[, or] . . . unconscionable' and 'did not engage in a sound reasoning process.'" *State v. Tanner*, 2025-Ohio-5689, ¶ 27 (12th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 66} The materials were obtained by Detective Abbitt pursuant to search warrants issued to Verizon and Meta, and she testified that she reviewed them during the course of her investigation. Although the trial court declined to admit the documents into evidence, Brock was permitted to cross-examine Detective Abbitt regarding their contents. Brock later proffered the documents—Exhibits U, V, W, and X—which are now before this court.

{¶ 67} Exhibit U is labeled "Meta Platforms Business Record" and contains messages and photographs associated with a user identified as "Bill Grippin." Detective Abbitt testified that she believed Pauley may have been associated with the account but acknowledged that she could neither confirm nor exclude Pauley as the account holder. The exhibit includes a photograph of a man wearing a wig, as well as images depicting

what appears to be large quantities of methamphetamine. Several messages attributed to the  account reference drug trafficking activity and threats of violence.

{¶ 68} Exhibits V, W, and X appear to consist of Verizon-related materials, including metadata, indexing notes, and a spreadsheet listing originator and recipient information. The documents do not show the messages exchanged between the numbers. Brock nonetheless argues that the records were critical to his defense because they purportedly show that Kristy Brock never sent a nude photograph of herself to Pauley. Brock contends that this evidence undermines the State's theory that he acted out of jealousy or rage stemming from a possible affair between Pauley and Kristy.

{¶ 69} Brock's argument, however, is disjointed and largely speculative. Although he initially invokes the business-records exception, his analysis shifts to the trial court's determination that the documents were not properly authenticated. Under Evid. R. 901(A), the authentication standard is liberal and may be satisfied through direct or circumstantial evidence sufficient to support a finding that the item is what its proponent claims. *State v. Garcia-Toro*, 2019-Ohio-5336, ¶ 30 (8th Dist.). Courts have recognized that social media accounts may be fabricated or manipulated. *State v. Gordon*, 2018-Ohio-2292, ¶ 69 (8th Dist.); *State v. Gibson*, 2015-Ohio-1679, ¶ 35 (6th Dist.). Here, Detective Abbitt testified that she obtained the records through search warrants and personally reviewed them, evidence that could, in some cases, be sufficient to satisfy Evid. R. 901(A). *See Garcia-Toro* at ¶ 30. However, given the lack of specific information regarding the messages in the Verizon records and the Facebook records not matching Pauley's name, the trial court did not act in an unreasonable, arbitrary, or unconscionable manner when it excluded this evidence.

{¶ 70} Even assuming for the sake of argument that the trial court erred by excluding the documents, any such error would be harmless. "Not every error requires

that a conviction be vacated or a new trial granted." *State v. Morris*, 2014-Ohio-5052, ¶ 24. Errors in evidentiary rulings are reviewed under the harmless-error standard. *State v. Echavarria*, 2004-Ohio-7044, ¶ 20 (12th Dist.). A reviewing court considers whether an error had an impact on the verdict, whether the error was not harmless beyond a reasonable doubt, and whether the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37.

{¶ 71} Brock failed to meaningfully connect the exclusion of the exhibits to any substantial, or even remote, impact on the jury's verdict. He asserts that their exclusion improperly bolstered the State's closing argument and limited his ability to present a theory involving a drug cartel targeting Pauley. He further speculates that the Facebook materials would have shown Pauley used disguises and engaged in violent conduct. He also references other matters largely untethered to the evidentiary ruling at issue, including his argument that he should have been able to introduce evidence found at Pauley's residence after his death. Aside from conclusory assertions, Brock provides little analysis explaining why the materials were admissible or how their exclusion affected the fairness of the trial, or the ultimate outcome of the verdict.

{¶ 72} Upon review, we find Brock's arguments to be without merit. Brock repeatedly asserts that the excluded documents would have enabled him to prove that his wife did not send a nude photograph to Pauley. However, we fail to see how the proffered exhibits establish that proposition. Baker testified that she observed a nude photograph of Kristy on Pauley's phone but was uncertain how the image had been transmitted. Because of Baker's lack of knowledge regarding the platform Kristy allegedly used to send this photograph, the admission of the Facebook and Verizon records would not have conclusively proven Brock's contention that Kristy never sent Pauley a nude photograph.

{¶ 73} Moreover, additional testimony supported the existence of an inappropriate relationship between Pauley and Kristy. Dustin Johnson testified that Brock told him that he confronted Pauley because "there was something going on, text message wise, between [Pauley] and his wife Kris [Kristy]" and that "they was sending explicit text messages back and forth." In light of Baker and Johnson's testimony, the excluded evidence would not have materially advanced Brock's claim.

{¶ 74} Likewise, within this assignment of error, Brock does not meaningfully address the evidentiary limitations governing the admissibility of a victim's character evidence (although he raises an assignment of error related to character evidence elsewhere, as analyzed below). *See* Evid. R. 404(A)(2); Evid. R. 405. Although Brock asserts that the Facebook messages and photographs demonstrated Pauley's drug trafficking and violent tendencies, the record reflects that defense counsel was permitted to question Detective Abbitt about these materials during cross-examination. Brock therefore cannot demonstrate that he was wholly deprived of the ability to present this theory to the jury.

{¶ 75} Here, the exclusion of the documents did not prejudice Brock. The State presented substantial evidence establishing that Brock confronted Pauley, threatened him with a firearm, and that the gun discharged during the encounter. Brock then concealed Pauley's death by burying his body and repeatedly provided false and inconsistent accounts regarding Pauley's disappearance. By trial, Brock advanced a theory involving fear of a Mexican cartel—an explanation the jury was free to accept or reject. *State v. Penwell*, 2023-Ohio-120, ¶ 23 (12th Dist.) (noting that the jury is in the best position to evaluate credibility and weigh the evidence).

{¶ 76} The trial court did not abuse its discretion when it excluded the Verizon and Facebook records. And even if it did err in this exclusion, the jury heard Brock's theories

and the evidence supporting them and nonetheless found him guilty. Any error excluding the proffered exhibits had no impact on the verdict, was harmless beyond a reasonable doubt, and did not undermine the reliability of the conviction.

{¶ 77} We overrule Brock's second assignment of error.

### C. Challenge to "Numerous" Evidentiary Rulings

{¶ 78} In his third assignment of error, Brock contends the trial court "made numerous improper evidentiary rulings." This court reviews these alleged errors under the same abuse of discretion standard described in the previous section.

### 1. Prior Consistent Statements

{¶ 79} Brock first argues the trial court erred by allowing the State to introduce improper hearsay under the guise of prior consistent statements.

{¶ 80} Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is inadmissible unless it falls within one of the enumerated exceptions in the rules or is otherwise excepted. *State v. Turner*, 2020-Ohio-1548, ¶ 31 (12th Dist.); *State v. Villani*, 2019-Ohio-1831, ¶ 22 (12th Dist.).

{¶ 81} Under Evid.R. 801(D)(1)(b), an out-of-court statement is not hearsay if the declarant testifies at trial, is subject to cross-examination, and the statement is consistent with the declarant's testimony and offered to rebut an express or implied charge of recent fabrication or improper influence or motive. *State v. Brown*, 2013-Ohio-1610, ¶ 16 (12th Dist.). The rule allows a party to rehabilitate a witness whose credibility has been attacked on grounds of fabrication or improper influence. *Id*.; *State v. Smith*, 2010-Ohio-1721, ¶ 102 (12th Dist.).

{¶ 82} For the rule to apply, the declarant must be subject to cross-examination, and the statement must be offered to rebut a claim of fabrication or improper influence.

*State v. Williams*, 2008-Ohio-3729, ¶ 12 (12th Dist.). In addition, the statement must have been made before the alleged motive to fabricate arose. *Brown* at ¶ 16; *Smith* at ¶ 103. In assessing admissibility, a trial court should take a broad view of the trial context to determine whether the witness has been sufficiently impeached to justify rehabilitation. *Smith* at ¶ 103.

{¶ 83} Brock fails to specifically identify the "numerous" statements he claims were improperly admitted. Instead, he broadly challenges testimony concerning Baker's prior statements, arguing the State improperly bolstered her credibility by eliciting testimony that her prior statements were consistent with her trial testimony. In support, Brock characterizes Baker's testimony as "ever evolving and changing." Yet the only basis he offers for that assertion is Baker's failure to initially disclose that she had been using methamphetamine.

{¶ 84} Brock does point to certain portions of the record in an apparent attempt to identify the alleged errors. For example, he references Steven Lee's testimony on the first day of trial (Jury Trial Day 1 p. 222—is Brock's description) where Lee testified, over objection, that Baker told him Pauley had been shot. He also challenges Sergeant Gates' testimony that Baker's account of the events in the basement was consistent with her written statement and her interview, notwithstanding some minor discrepancies. Brock is even more imprecise in citing pages 30 through 36 of the second day of trial, where Sergeant Meehan testified about his investigation, including Baker's phone call reporting that Pauley had been shot.

{¶ 85} Here, Baker testified at trial and was subject to cross-examination regarding the same matters contained in the challenged statements. Baker's testimony was largely consistent with the statements contained in the various out-of-court statements the State elicited testimony about. This satisfies several requirements under the hearsay exception

for prior consistent statements under Evid.R. 801(D)(1)(b). The question remains whether the State elicited this evidence in order to "rebut an express or implied charge against [Baker] of recent fabrication or improper influence or motive." *Id*. From the record, it is not clear the State presented this evidence to counter a charge from Brock that Baker was lying in her testimony. While a somewhat close call, Brock did not specifically accuse Baker of lying—rather, he focused on damaging her credibility because of her methamphetamine use. This weighs against the admissibility of this evidence since it appears to have been used to improperly bolster Baker's *credibility*, not her *truthfulness*.

{¶ 86} But even assuming some of the challenged testimony constituted inadmissible hearsay, any error would be harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See State v. Warnock*, 2024-Ohio-382, ¶ 26 (12th Dist.) (erroneous evidentiary rulings reviewed under harmless-error standard). An error is harmless when the error did not impact the verdict and the remaining evidence establishes guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37.

{¶ 87} Although Brock's objections lack precision, the prior statements appear largely cumulative of Baker's live testimony concerning the events in the basement and the shooting itself. *State v. L.E.F.*, 2014-Ohio-4585, ¶ 14 (10th Dist.) ("[I]nsofar as [victim]'s statements may have been [inadmissible], we conclude such admission constitutes harmless error because the statements were cumulative of [victim]'s live trial testimony, which was subject to cross-examination."); *State v. Deanda*, 2014-Ohio-3668, ¶ 39 (3d Dist.) ("[h]earsay statements admitted that are repetitious of admissible statements and are supported by overwhelming evidence are not prejudicial").

{¶ 88} Moreover, although Brock emphasizes Baker's delayed disclosure of her methamphetamine use, the jury was fully informed of her drug use and its potential impact

on her credibility. More importantly, the State presented substantial independent evidence of guilt, including the "presumptive positive" blood evidence observed in the basement, Brock's admission that he buried Pauley's body, and Brock's inconsistent explanations of the incident. Accordingly, we find no merit to Brock's claims concerning the admission of prior consistent statements.

*2. Precluding Specific Instances of Conduct*

**{¶ 89}** Brock next argues that the trial court erred by preventing him from presenting specific information concerning Pauley and Pauley's alleged propensity for violence.

**{¶ 90}** Evid.R. 404(A) provides that, though it may be relevant, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." (Emphasis added.) "The term 'character' refers to a generalized description of a person's disposition or a general trait such as honesty, temperance, or peacefulness. Generally speaking, character refers to an aspect of an individual's personality which is usually described in evidentiary law as a 'propensity.'" *State v. Herron*, 2019-Ohio-3292, ¶ 25-26 (2d Dist.), quoting *Weissenberger's Ohio Evidence Treatise*, Section 404.3 (2009 Ed.). This prohibition applies equally to evidence offered regarding a victim's character. See Evid.R. 404(A)(2).

**{¶ 91}** Character evidence, however, may be admissible in limited circumstances. Evid.R. 405 governs the methods of proving character when such evidence is otherwise admissible and provides two avenues for doing so:

> (A) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
>
> (B) Specific Instances of Conduct. In cases in which character

or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

{¶ 92} The Ohio Supreme Court has held that "[a] defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." *State v. Barnes*, 2002-Ohio-68, syllabus. However, *Barnes* did not address whether such evidence may be admissible for another purpose, such as establishing the defendant's state of mind. *Id*. at fn. 3 ("We express no opinion here as to whether evidence of specific instances of a victim's conduct is admissible for other purposes in a self-defense case."). Since *Barnes*, numerous Ohio appellate courts have recognized that a defendant may testify about specific instances of the victim's prior conduct to establish the defendant's state of mind. *See State v. Steinhauer*, 2014-Ohio-1981, ¶ 30 (4th Dist.) (collecting cases); *State v. Rice*, 2022-Ohio-3291, ¶ 70 (7th Dist.) (same).

{¶ 93} Here, the trial court granted a motion in limine prohibiting testimony and evidence—other than Brock's own testimony—offered "to show the victim's propensity for violence." The court expressly permitted Brock to testify from his personal knowledge regarding what he knew about Pauley's propensity for violence. However, the court ruled that testimony concerning "outstanding warrants, etc." was not within Brock's personal knowledge and excluded such evidence for that purpose.

{¶ 94} Contrary to Brock's assertion, the record does not support his claim that he was prevented from presenting "negative information" about Pauley. During cross-examination of Sheriff Estes, defense counsel elicited reputation evidence concerning Pauley. Sheriff Estes testified that Pauley's reputation involved "drugs" and that Pauley was a "drug dealer." Brock also testified extensively regarding his own perceptions, his claimed fear for his family, and the self-defense narrative he presented to the jury.

- 29 -

{¶ 95} Moreover, although Brock argues the trial court should have admitted evidence concerning Pauley's criminal charges and information related to a search warrant, the record reflects that Brock was unaware of those matters at the time of the incident. Accordingly, those facts could not have affected Brock's state of mind. *See State v. Wadlington*, 2024-Ohio-1268, ¶ 26 (8th Dist.) (excluding evidence of the victim's criminal history where the defendant was unaware of it at the time of the shooting). The State bore the burden of proving Brock did not act in self-defense, which does implicate showing Brock did not have a bona fide belief that "he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force." *Byrd*, 2020-Ohio-3073, at ¶ 23.

{¶ 96} The trial court allowed reputation testimony that Pauley dealt drugs, along with Brock's testimony of his knowledge of Pauley's outstanding warrants and being on the run. This testimony supported Brock's self-defense assertions because it gave credence to his argument that he feared Pauley. But evidence unknown to Brock at the time of the shooting incident, like evidence discovered during the execution of a search warrant or information concerning Pauley's subsequent indictment would not explain why Brock believed he was justified in using force in the moment. Upon review, we find no merit in Brock's arguments regarding the exclusion of specific instances of Pauley's conduct.

{¶ 97} We overrule Brock's third assignment of error.

**D. Closing Statements**

{¶ 98} In his fourth assignment of error, Brock argues that the State engaged in prosecutorial misconduct during closing argument.

{¶ 99} Prosecutors are afforded considerable latitude in closing argument. *State v. Layne*, 2010-Ohio-2308, ¶ 58 (12th Dist.). Prosecutorial misconduct occurs only when

remarks are improper and prejudicially affected the defendant's substantial rights. *State v. Elmore*, 2006-Ohio-6207, ¶ 62. The relevant inquiry is the fairness of the trial as a whole, not the prosecutor's personal credibility. *State v. Gray*, 2012-Ohio-4769, ¶ 57 (12th Dist.). Reversal is warranted only when the remarks deprived the defendant of a fair trial. *Layne* at ¶ 60.

{¶ 100} Because Brock did not object at trial, he has waived all but plain error review. *State v. Cotton*, 2004-Ohio-4409, ¶ 19 (12th Dist.). Under a plain error analysis, a conviction will not be reversed unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Dougherty*, 2014-Ohio-4760, ¶ 53 (12th Dist.).

{¶ 101} During closing argument, the State responded directly to Brock's testimony suggesting that a Mexican cartel was involved in the events surrounding Pauley's death. Brock asserts that the prosecutor referenced the cartel approximately 23 times during closing argument, emphasizing eight of those references on appeal. The challenged remarks included characterizing Brock's theory as implausible, questioning when the city had become "a bloody battleground for cartel turf wars," and asking why a cartel would be concerned with an individual such as Pauley, who was not a significant participant in the drug trade.

{¶ 102} In support of his claim, Brock reiterates his earlier arguments regarding the exclusion of evidence relating to Pauley's criminal conduct. He contends that the State aggressively sought to exclude such evidence and then "pounced on the opportunity" during closing argument to undermine his credibility. Brock argues that the State exceeded the permissible scope of closing argument by effectively mocking his testimony.

{¶ 103} We find Brock's arguments unpersuasive. The State's references to the Mexican cartel were made in direct response to a defense theory advanced through Brock's own testimony. The remarks constituted fair comment on the evidence and a

permissible rebuttal to Brock's explanation of event, particularly in light of his earlier denials of any knowledge concerning Pauley's disappearance. Moreover, the State's argument challenging the credibility of Brock's testimony was within the bounds of proper advocacy.

{¶ 104} Finally, although not dispositive, the trial court properly instructed the jury that statements made during closing arguments are not evidence. We presume the jury followed those instructions. *Gray*, 2012-Ohio-4769, at ¶ 62 (12th Dist.). The record does not support a finding of prosecutorial misconduct.

{¶ 105} We overrule Brock's fourth assignment of error.

## E. Immunity

{¶ 106} In his fifth assignment of error, Brock argues that the trial court erred by granting immunity to Dustin Johnson. The Fifth Amendment privilege against self-incrimination protects a witness from being compelled to provide testimony that could be used against him in future criminal proceedings. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

{¶ 107} Brock contends the trial court failed to comply with the procedure set forth in Ohio law and violated additional protections afforded by the Fifth Amendment of the United States Constitution. Although he does not expressly invoke the Ohio Constitution, similar protections are provided under Article I, Section 10 of the Ohio Constitution. Brock asserts several alleged errors: that immunity was granted without a valid invocation of the privilege, that immunity was improperly extended to conduct excluded by the statute, that the court failed to make the findings necessary to compel testimony, that the court's failure to disclose the full immunity process to the jury violated his confrontation rights, and that the cumulative effect of these alleged errors rendered the trial fundamentally unfair.

{¶ 108} Ohio law permits the State, upon written request, to seek an order compelling testimony when a witness indicates an intent to invoke the Fifth Amendment privilege against self-incrimination. R.C. 2945.44 ("Immunity Statute"). The Immunity Statute authorizes the trial court to grant immunity and compel testimony when appropriate, unless doing so would not serve the administration of justice. *Id*. The privilege applies when testimony could furnish a link in the chain of evidence leading to prosecution and does not require an express admission of guilt. *State v. Reiner*, 2000-Ohio-190, ¶ 47. Evidentiary and procedural rulings in this context warrant reversal only upon a showing of prejudice affecting substantial rights. Crim.R. 52(A).

{¶ 109} During trial, the State filed a written motion seeking an order compelling testimony and granting immunity to Johnson pursuant to the Immunity Statute. Outside the presence of the jury, Johnson took the stand and, on advice of counsel, stated he would not answer any questions, thereby unequivocally invoking his Fifth Amendment privilege. The State then explained its rationale for the request, noting that Johnson was expected to provide testimony regarding statements made by Brock and information concerning the concealment of Pauley's body.

{¶ 110} The trial court advised Johnson that, if immunity were granted, he would be compelled to testify and could be held in contempt for refusing to do so. The court also referenced the statutory exclusions for perjury, tampering, falsification, and contempt. The court then issued a written entry finding that Johnson had indicated an intent to invoke the Fifth Amendment, acknowledging the State's request, finding the testimony necessary and material, granting immunity pursuant to the Immunity Statute, and compelling Johnson's testimony.

{¶ 111} Brock's challenges to the immunity procedure do not demonstrate reversible error. The Immunity Statute does not require a question-by-question invocation

of the Fifth Amendment where a witness refuses to testify altogether. *See State v. Kirk*, 72 Ohio St.3d 564 (1995), paragraph one of the syllabus. Johnson's categorical refusal to answer any questions constituted a sufficient invocation of the privilege under the statute. Nor did the trial court's reference to statutory exceptions for perjury, tampering, falsification, or contempt undermine the scope of immunity, as those exceptions reflect conduct not protected by immunity and remain independently punishable.

{¶ 112}   We also find no violation of Brock's confrontation rights. Johnson testified before the jury pursuant to the immunity order, and defense counsel cross-examined him extensively. Defense counsel questioned him regarding the immunity arrangement, alleged pressure from law enforcement, and his potential bias or motives for testifying, including the suggestions of threats of drug charges and involvement in Pauley's death. The jury therefore had a full opportunity to assess his credibility.

{¶ 113}   Finally, even assuming for the sake of argument any procedural deficiency in the immunity process, we find any error harmless under Crim.R. 52(A). The jury heard testimony from Baker, forensic evidence regarding the cause of death, and Brock's own admissions concerning his involvement in concealing Pauley's body and disposing of evidence. In light of this independent evidence, Brock has not shown a reasonable probability that the outcome of the trial court would have been different absent the alleged error.

{¶ 114}   We overrule Brock's fifth assignment of error.

## F. Sentence

{¶ 115}   In his sixth assignment of error, Brock argues that the trial court erred by imposing consecutive prison terms. A felony sentence is reviewed under the standard set forth in R.C. 2953.08(G)(2). *State v. Warnock*, 2024-Ohio-382, ¶ 64 (12th Dist.). Under that statute, an appellate court may modify or vacate a sentence only if it clearly and

convincingly finds that the record does not support the trial court's findings under the relevant sentencing statutes or that the sentence is otherwise contrary to law. *State v. Gable*, 2024-Ohio-293, ¶ 8 (12th Dist.).

{¶ 116} A sentence imposing consecutive terms is contrary to law when the trial court fails to make the findings required by R.C. 2929.14(C)(4). *State v. Wood*, 2020-Ohio-422, ¶ 9 (12th Dist.). That statute requires the trial court to engage in a three-step analysis before imposing consecutive sentences. Specifically, the court must find that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) [as relevant here]:

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

R.C. 2929.14(C)(4).

{¶ 117} To impose consecutive sentences, the trial court must make these findings at the sentencing hearing and incorporate them into its sentencing entry. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. Although the court is not required to state reasons supporting its findings, the record must reflect that it engaged in the required analysis and made the statutory findings. *State v. Miller*, 2022-Ohio-1438, ¶ 10 (12th Dist.).

{¶ 118} Brock does not dispute that the trial court made the first two findings—that consecutive sentences were necessary to protect the public and to punish him, and that they were not disproportionate to the seriousness of his conduct or the danger he poses. Instead, he argues that the court failed to make the third required finding under R.C.

2929.14(C)(4), specifically that the offenses were committed as part of a course of conduct and that the resulting harm was so great or unusual that no single prison term adequately reflects the seriousness of the conduct.

{¶ 119} The record does not support Brock's contention. At the sentencing hearing, the trial court expressly addressed Brock's course of conduct and stated:

> This Court finds this crime was committed as a separate act in an effort to evade detection for the murder of Chad Pauley, in which caused a separate distinct and ongoing harm to the family of Chad Pauley. Accordingly, the Court finds that consecutive sentences are necessary to protect the public and punish the defendant and are not disproportionate to the seriousness of the defendant's conduct and the danger posed to the public.

{¶ 120} Although Brock acknowledges the trial court used this language, he argues it was insufficiently specific. That argument is unpersuasive. While a trial court must make the statutory findings, it is not required to recite the exact language of R.C. 2929.14(C)(4). *State v. Downing*, 2024-Ohio-381, ¶ 16 (12th Dist.).

{¶ 121} Here, the trial court ordered that Brock's sentences for gross abuse of a corpse and two counts of tampering with evidence be served consecutively to the sentence imposed for murder in Count 4. In doing so, the court found that the offenses of gross abuse of a corpse and tampering with evidence were committed separately to evade detection and caused separate, distinct, and ongoing harm to Pauley's family. The court further determined that consecutive sentences were necessary to protect the public and to punish Brock and were not disproportionate to the seriousness of his conduct or the danger he posed.

{¶ 122} These findings were well supported by the record. Brock not only murdered Pauley but did so in a calculated manner designed to avoid detection. He admitted to disposing of the weapon used in the shooting and to using a backhoe and

chains to bury Pauley in a manner that concealed the death for months. During that time, Brock repeatedly lied to law enforcement and others searching for Pauley, despite knowing what had occurred and what he had done with Pauley's body.

{¶ 123} The trial court further incorporated the relevant consecutive sentencing findings into its sentencing entry. From the trial court's statements at the sentencing hearing and the language used in the sentencing entry, it is clear that the trial court complied with R.C. 2929.14(C)(4). *Bonnell* at ¶ 37; *State v. Sess*, 2016-Ohio-5560, ¶ 38 (12th Dist.).

{¶ 124} Following review, we find the record shows that the trial court made all required consecutive-sentence findings, and those findings are supported by the record.

{¶ 125} Brock's sixth assignment of error is overruled.

### G. Transcript of Proceedings

{¶ 126} In his seventh assignment of error, Brock argues the trial court erred by failing to ensure the proceedings were properly recorded. Crim.R. 22 provides that in serious offense cases, all proceedings shall be recorded. Although the proceedings in this case were recorded, portions of the transcript were later found to be inaudible.

{¶ 127} When a transcript is unavailable or incomplete, an appellant may utilize App.R. 9(C)(1), which permits the preparation of a statement of the proceedings based on the appellant's recollection. *Klein Eng., L.L.C. v. Thiemann*, 2026-Ohio-1233, ¶ 8 (12th Dist.). Brock did not avail himself of this procedure. Nor does he identify with any specificity how the inaudible portions of the transcript prejudiced his appeal. General assertions that missing portions of the record may be relevant are insufficient to demonstrate material prejudice. *State v. Roome*, 2017-Ohio-4230, ¶ 12 (12th Dist.).

{¶ 128} Here, Brock offers only generalized allegations of prejudice and fails to identify any concrete impact the transcript deficiencies had on his assignments of error.

Although he asserts that reconstruction of the record may be unreliable or even impossible in cases involving "extensive, disputed, or highly technical" subject matter, he does not explain why those concerns apply in present case. This court will not speculate to supply that missing connection. *State v. Thompson*, 2021-Ohio-2632, ¶ 17 (12th Dist.) (appellate courts will not speculate or guess about matters not reflected in the record). Moreover, as discussed above, the record provided is sufficient to permit full appellate review of the issues raised, and no additional reconstruction of the proceedings is necessary to resolve the appeal.

{¶ 129} We overrule Brock's seventh assignment of error.

### H. Cumulative Error

{¶ 130} In support of his eighth assignment of error, Brock argues his conviction must be reversed under the cumulative-error doctrine. Under that doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. McClurkin*, 2010-Ohio-1938, ¶ 105 (12th Dist.).

{¶ 131} After thoroughly reviewing the record, we find no merit to any of Brock's assignments of error. Because Brock has failed to demonstrate the existence of multiple errors, he cannot establish cumulative error. *State v. Kaufhold*, 2020-Ohio-3835, ¶ 63 (12th Dist.). Accordingly, we find the cumulative-error doctrine inapplicable here.

{¶ 132} We overrule Brock's eighth assignment of error.

{¶ 133} Judgment affirmed.

BYRNE, P.J., and HENDRICKSON, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robert A. Hendrickson, Judge*

*/s/ Melena S. Siebert, Judge*